**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**November 7, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

RALPH LEROY MENZIES,

　　　　Petitioner - Appellant,

v.

ROBERT POWELL, Warden of the
Utah State Penitentiary,

　　　　Respondent - Appellee.

No. 19-4042

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:03-CV-00902-CVE-FHM)**

_____

Lindsey Layer, Assistant Federal Public Defender (Jon M. Sands, Federal
Public Defender, and Eric Zuckerman, Assistant Federal Public Defender,
with her on the briefs), Phoenix, Arizona, for Petitioner-Appellant.

Erin Riley, Assistant Solicitor General (Sean D. Reyes, Utah Attorney
General, Andrew F. Peterson and Aaron G. Murphy, Assistant Solicitors
General, with her on the briefs), Salt Lake City Utah, for Respondent-
Appellee.

_____

Before **HARTZ**, **BACHARACH**, and **EID**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

## TABLE OF CONTENTS

1.    Mr. Menzies's Murder Conviction and Sentence ...........................10

2.    Appellate and Post-Conviction Proceedings ..................................12

3.    Federal Habeas Proceedings.......................................................13

4.    Standard of Review .....................................................................13

5.    The Utah Supreme Court reasonably rejected Mr. Menzies's
      claims of ineffective assistance of counsel during the guilt
      phase..........................................................................................15

      5.1       Standard for Obtaining Relief Based on Ineffective
                Assistance of Counsel ...............................................16

      5.2       Identification Testimony at Trial  ..............................17

      5.2.1     Photo Arrays  ...........................................................18

      5.2.2     Identification of Objects ...........................................18

      5.2.3     Lineup .....................................................................19

      5.3       The Utah Supreme Court's Disposition of Claims
                Involving Identification Testimony ............................19

      5.4       Mr. Menzies's Challenges to the Utah Supreme
                Court's Decision........................................................20

      5.4.1     The Photo Arrays......................................................21

      5.4.1.1    Deficiency ...............................................................21

      5.4.1.1.1  Statement that a Suspect was Already in Custody..........21

      5.4.1.1.2  Second Viewing of the Photo Array ...........................22

      5.4.1.1.3  Lack of an Admonition.............................................24

      5.4.1.1.4  False Dichotomy......................................................25

2

5.4.1.2    Prejudice ................................................................26

5.4.2    The Lineup ..............................................................27

5.4.3    The Identification of Objects ....................................28

5.4.4    Failure to Investigate the Account of Mr. Larrabee and His Girlfriend ...............................................33

5.5    Failure to Challenge the Testimony of Walter Britton .................................................................35

5.5.1    The Utah Supreme Court's Disposition of the Claim .....36

5.5.2    Mental-Health Evidence ............................................37

5.5.3    Benefits from Testimony ...........................................40

5.5.4    Mr. Benitez's Statement ...........................................43

5.5.4.1    Procedural Default ....................................................43

5.5.4.2    Merits .....................................................................50

6.    The trial court's instruction on reasonable doubt constituted a reasonable application of Supreme Court precedent and conformed to the Constitution ..................................................51

6.1    Reasonableness of the Utah Supreme Court's Decision ...............................................................52

6.1.1    Substantial Doubt ....................................................53

6.1.2    Willingness to Act ....................................................56

6.2    Absence of a Constitutional Violation .........................58

7.    The Utah Supreme Court reasonably rejected Mr. Menzies's claim of ineffective assistance of counsel during sentencing...........59

7.1    The Evidence Presented in State Court ........................59

7.2    Mr. Menzies's Theories of Ineffectiveness  .................60

7.3     The Attorney's Duty to Investigate ............................60

7.4     Bar to Considering Evidence Presented in Federal Court ....................................................................61

7.5     Delayed Investigation of the Mitigating Evidence ........64

7.6     Failure to Investigate Other Mitigating Evidence .........65

7.7     Failure to Present Evidence of Organic Brain Damage ...................................................................67

8.  The Utah Supreme Court acted reasonably in rejecting Mr. Menzies's challenges to the admissibility of documents from his prison file .......................................................................70

8.1     The Utah Supreme Court reasonably concluded that introduction of mental-health evaluations had not violated the Fifth Amendment.....................................70

8.2     Introduction of Mr. Menzies's prison file did not deny the right to confrontation, constitute a denial of due process, or entail cruel and unusual punishment...............................................................77

8.2.1   Confrontation Clause ..............................................77

8.2.2   Due Process...........................................................79

8.2.3   Cruel and Unusual Punishment ..................................80

9.  The Utah Supreme Court reasonably concluded that the trial court had not violated the Constitution by relying on uncharged aggravating circumstances ......................................................81

9.1     Utah law allowed the prosecution to allege additional aggravating circumstances at sentencing.......82

9.2     Mr. Menzies obtained adequate notice of the aggravating circumstances bearing on the sentence .......84

9.3      The prosecution did not need to prove each aggravating circumstance beyond a reasonable doubt ...................................................................89

9.4      The Utah Supreme Court didn't violate any constitutional rights by omitting discussion of two aggravating circumstances from the analysis of harmless error ...........................................................90

10.   The Utah Supreme Court reasonably rejected Mr. Menzies's challenge to the constitutionality of the aggravating circumstances ...............................................................91

10.1      Aggravating Circumstances for Murders that are Heinous, Atrocious, and Cruel .....................................92

10.1.1      Merits ...........................................................93

10.1.2      Consideration of Mitigating Factors .............................96

10.2      Sufficiency of the Evidence on Aggravating Circumstances ..........................................................96

10.3      Reasonable jurists could reject Mr. Menzies's claim involving reliance on duplicative aggravating circumstances ........................................................97

11.   In rejecting Mr. Menzies's challenges involving errors in the trial transcript, the Utah Supreme Court reasonably applied Supreme Court precedent and found the pertinent facts .................99

11.1      The Utah courts provided the parties with an opportunity to correct errors in the trial transcript ......100

11.2      The trial court found no constitutional violation, and the record contained two versions of the transcript ...............................................................101

11.3      The Utah Supreme Court upheld the trial court's ruling that the transcript was accurate enough for a meaningful appeal ...................................................101

11.4    The Utah Supreme Court's decision was not based on an unreasonable application of clearly established federal law ............................................. 102

11.5    The Utah Supreme Court did not base its decision on an unreasonable determination of fact .................. 106

11.5.1    Reliance on the Docketing Statement ........................ 106

11.5.2    Failure to Provide a Sufficient Transcript of Voir Dire ..................................................................... 108

11.5.3    Omission of a Conference Outside the Jury's Presence ................................................................... 112

11.5.4    Additions by the Note Reader .................................. 115

11.5.5    Errors Involving Numbers ....................................... 118

12.    A certificate of appealability is unwarranted on the admissibility at trial of Mr. Britton's testimony from the preliminary hearing ................................................................. 122

12.1    Standard for a Certificate of Appealability ................ 123

12.2    Mr. Britton's Unavailability ..................................... 124

12.3    Reliability ............................................................... 125

13.    Conclusion ......................................................................... 126

Mr. Ralph Leroy Menzies was convicted of first-degree murder in Utah state court and sentenced to death. The Utah Supreme Court affirmed the denial of his motion for a new trial, *State v. Menzies*, 845 P.2d 220, 242 (Utah 1992), and then affirmed his conviction and death sentence, *State v. Menzies*, 889 P.2d 393, 396 (Utah 1994). Mr. Menzies sought post-conviction relief, but the state courts rejected his claims. *Menzies v. Galetka*, 150 P.3d 480, 489 (Utah 2006); *Menzies v. State*, 344 P.3d 581, 588 (Utah 2014).

The state court decisions led Mr. Menzies to seek habeas relief in federal court. The federal district court denied relief, prompting Mr. Menzies to appeal. We affirm.

In this appeal, we address eight issues:

1. **Ineffective assistance of trial counsel in the guilt phase.** To establish ineffective assistance of counsel, a criminal defendant must show that his attorney's performance was deficient and prejudicial. Mr. Menzies argued to the Utah Supreme Court that his counsel had been deficient by failing to

   - move for suppression of identification testimony,

   - investigate the accounts from prosecution witnesses identifying Mr. Menzies, and

   - challenge the admissibility of testimony from the preliminary hearing.

   Although these three challenges weren't made, Mr. Menzies's trial counsel undermined the prosecution's case in other ways. Counsel pointed out that the witnesses couldn't definitively identify Mr. Menzies and challenged the credibility of the

7

prosecution's witnesses. Given these challenges to the prosecution's case, the Utah Supreme Court concluded that trial counsel's performance was neither deficient nor prejudicial. Habeas relief is warranted only if this conclusion constituted an unreasonable application of the United States Supreme Court's precedent. Under this standard, habeas relief was unwarranted because the state appellate court had reasonably applied the United States Supreme Court's precedents.

2. **Jury instruction on reasonable doubt.** Under the Fourteenth Amendment's Due Process Clause, a trial court must instruct the jury that the prosecution bears the burden of proving guilt beyond a reasonable doubt. The trial court gave this instruction, adding that the doubt must be substantial and real rather than imaginary. The Utah Supreme Court determined that this additional explanation hadn't tainted the jury instruction. This determination constituted a reasonable application of the United States Supreme Court's precedents.

3. **Ineffective assistance of counsel in the sentencing phase.** At the sentencing phase, counsel's performance may be deficient if the attorney fails to conduct a thorough investigation of mitigating circumstances. Mr. Menzies's attorneys conducted a reasonably thorough investigation. So the Utah Supreme Court reasonably rejected Mr. Menzies's claim of ineffective assistance in the sentencing phase.

4. **Introduction of statements made during psychiatric evaluations.** The United States Supreme Court has not interpreted the Fifth Amendment to bar admission of a defendant's un-*Mirandized* statements made during psychiatric evaluations preceding the charged crime. The psychiatric evaluations—conducted without *Miranda* warnings—had preceded the alleged murder. So the Utah Supreme Court reasonably rejected Mr. Menzies's Fifth Amendment challenge to the introduction of his statements for his psychiatric evaluations.

5. **Introduction of Mr. Menzies's prison file.** The trial court allowed the prosecution to use Mr. Menzies's prison file at the sentencing stage, and the Utah Supreme Court upheld this ruling. And the Supreme Court has not

8

- applied the Sixth Amendment's Confrontation Clause to sentencing proceedings or

- found a violation of due process from the introduction of false or misleading prison records.

Given the absence of governing precedent, the Utah Supreme Court acted reasonably in concluding that the introduction of the prison file hadn't violated Mr. Menzies's rights to confrontation or due process.

6. **Notice of aggravating circumstances.** A defendant has a right to notice of aggravating circumstances. The Utah Supreme Court concluded that the State had satisfied this right through the statute identifying the aggravating circumstances that render a defendant eligible for the death penalty. In reaching this conclusion, the Utah Supreme Court reasonably applied the United States Supreme Court's precedents. Under those precedents, a state appeals court could reasonably conclude that notice could come from Utah's statutory list of aggravating circumstances.

7. **Duplication of aggravating circumstances.** In identifying aggravating circumstances warranting a death sentence, the prosecution must provide a meaningful distinction between capital and non-capital murders.

The jury found that Mr. Menzies was eligible for the death penalty because he had committed a murder in connection with a robbery and an aggravated kidnapping. After the jury found Mr. Menzies eligible for the death penalty, the trial court found duplicative aggravating circumstances involving pecuniary gain and robbery. The Utah Supreme Court rejected Mr. Menzies's characterization of these duplicative aggravating circumstances as a violation of the Eighth Amendment. This conclusion constituted a reasonable application of the record and the United States Supreme Court's precedents.

8. **Errors in the trial transcript.** A criminal defendant has a constitutional right to a record that's reliable enough to provide meaningful appellate review. The transcript of Mr. Menzies's trial contained errors, but Mr. Menzies did not show prejudice to his appeal. Given this failure to show prejudice, the Utah

9

> Supreme Court reasonably rejected Mr. Menzies's claim involving errors in the trial transcript.

Mr. Menzies has not only presented these appellate arguments but also moved to expand the certificates of appealability. In part of this motion, Mr. Menzies argues that he should be allowed to appeal the denial of his claim involving the introduction of testimony from a preliminary hearing.[1] We reject this argument, concluding that no jurist could reasonably credit this claim. So we deny Mr. Menzies's motion to expand the certificates of appealability.

## 1.    Mr. Menzies's Murder Conviction and Sentence

This case grew out of the 1986 disappearance of Mrs. Maurine Hunsaker. At a gas station where Mrs. Hunsaker had been working, law enforcement had found an empty cashier's booth and customers waiting to pay. Cash was missing from the register.

Two days after Mrs. Hunsaker had disappeared, her corpse was found in a wooded area outside Salt Lake City. Someone had strangled Mrs. Hunsaker and slashed her throat.

Suspicion quickly turned to Mr. Menzies. On the morning after Mrs. Hunsaker's disappearance, two teenagers saw a man and a woman walking into the wooded area. The teenagers heard a woman scream and then saw

---

[1]    In this motion, Mr. Menzies also requested expansion of the certificates of appealability to encompass errors in the trial transcript. The Court previously granted this part of the motion.

the man returning to his car. After hearing reports about Mrs. Hunsaker's body, one of the teenagers (Tim Larrabee) contacted the police and described the man.

Based on Mr. Larrabee's description, the police created a composite drawing of the man and picked three photographs of possible matches, including that of Mr. Menzies. The police showed these three photographs and three others to Mr. Larrabee. From these photographs, Mr. Larrabee picked the one of Mr. Menzies and said that he looked like the man in the wooded area.

The police also obtained other incriminating evidence showing (1) Mrs. Hunsaker's presence in Mr. Menzies's car and apartment, (2) Mr. Menzies's possession of Mrs. Hunsaker's identification cards, and (3) Mr. Menzies's confession to the murder.

First, the police found Mrs. Hunsaker's thumbprint in the car that Mr. Menzies had been driving. And in Mr. Menzies's apartment, officers found

- roughly the same amount of cash ($116) that had been missing from the gas station and

- Mrs. Hunsaker's purse.

Along with the cash and purse, the police matched fibers found on Mrs. Hunsaker's clothing to carpet fibers in Mr. Menzies's apartment.

11

Second, the police found evidence that Mr. Menzies had discarded Mrs. Hunsaker's identification cards. As the police were investigating Mrs. Hunsaker's disappearance, they arrested Mr. Menzies on an unrelated charge. Upon his booking into the jail, he raced into a changing room. In that room, an officer later found Mrs. Hunsaker's identification cards. And Mrs. Hunsaker's social security card turned up in the belongings of Mr. Menzies's girlfriend.

Third, a fellow jail inmate testified that Mr. Menzies had confessed to killing Mrs. Hunsaker. According to the inmate, Mr. Menzies had admitted cutting her throat.

A jury found Mr. Menzies guilty of capital homicide and aggravated kidnapping. After this finding, Mr. Menzies waived his right to sentencing by a jury, opting for the trial judge to decide the sentence. So the trial judge conducted the penalty phase, obtaining additional evidence and eventually sentencing Mr. Menzies to death.

## 2.        Appellate and Post-Conviction Proceedings

After sentencing, Mr. Menzies moved for a new trial on the ground that the transcript contained too many errors for appellate review. The trial court denied the motion, and the Utah Supreme Court affirmed the denial of relief as to the transcription errors. *State v. Menzies*, 845 P.2d 220, 242 (Utah 1992). Mr. Menzies then appealed on the merits, and the Utah

12

Supreme Court affirmed the conviction and sentence. *State v. Menzies*, 889 P.2d 393, 396 (Utah 1994).

Following the direct appeal, Mr. Menzies sought post-conviction relief in state court, alleging ineffective assistance of counsel. The state trial court denied post-conviction relief. The Utah Supreme Court first remanded for further proceedings, *Menzies v. Galetka*, 150 P.3d 480, 489 (Utah 2006), and then affirmed the denial of post-conviction relief, *Menzies v. State*, 344 P.3d 581, 588 (Utah 2014).

**3.        Federal Habeas Proceedings**

Mr. Menzies sought federal habeas relief, presenting 43 claims. The district court denied habeas relief, and Mr. Menzies obtained a certificate of appealability on 9 of the claims. In these claims, he alleged ineffectiveness of his counsel during the guilt and penalty stages, error in the jury instruction on reasonable doubt, introduction of inadmissible evidence in the sentencing phase, failure to properly channel the trial judge's discretion through aggravating circumstances, and errors in the trial transcript.

**4.        Standard of Review**

We engage in de novo review of the federal district court's legal analysis, applying the same standard as the district court. *Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013). In district court, review is deferential when the state appellate court has rejected a claim on the

13

merits. *Rainer v. Hansen*, 952 F.3d 1203, 1206 (10th Cir. 2020). After the

state appellate court has rejected a claim, the federal district court can

reach the merits only if the state court's decision was

- contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or

- based on an unreasonable determination of the facts given the evidence presented in state court.

28 U.S.C. § 2254(d).

To determine whether a state-court decision conflicted with or

unreasonably applied clearly established law, we make two determinations.

*Budder v. Addison*, 851 F.3d 1047, 1051 (10th Cir. 2017). We first

determine whether the Supreme Court has clearly established the pertinent

constitutional protection. *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir.

2008). We then ask whether the state court's decision was contrary to, or

involved an unreasonable application of, that precedent. *Id.*

Our deference extends not only to the state court's legal conclusions

but also its factual findings. For these findings, we defer to the state court

unless it "plainly misapprehend[ed] or misstate[d] the record in making

[its] findings, and the misapprehension goes to a material factual issue that

is central to [the] petitioner's claim." *Ryder ex rel. Ryder v. Warrior*, 810

F.3d 724, 739 (10th Cir. 2016) (quoting *Byrd v. Workman*, 645 F.3d 1159,

1171–72 (10th Cir. 2011)). To overcome the state court's factual findings,

14

the petitioner must show that the findings are objectively unreasonable. *Smith v. Aldridge*, 904 F.3d 874, 880 (10th Cir. 2018).

If the state's highest court acted unreasonably in applying Supreme Court precedent or in finding facts, the district court must decide whether the conviction or sentence had violated federal law or the federal constitution. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007) (stating that 28 U.S.C. § 2254(d) provides "precondition[s] to the grant of habeas relief . . . , not an entitlement to it"); *Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015) ("[E]ven when petitioners satisfy the threshold in § 2254(d), they must establish a violation of federal law or the federal constitution.").

**5.      The Utah Supreme Court reasonably rejected Mr. Menzies's claims of ineffective assistance of counsel during the guilt phase.**

Mr. Menzies claims ineffective assistance of counsel in the guilt phase based on his attorneys' failure to

- seek suppression of the identification testimony of Mr. Larrabee, a witness who testified that he had seen a man resembling Mr. Menzies in the area where Mrs. Hunsaker's body was discovered,

- investigate the accounts of Mr. Larrabee and his girlfriend, and

- investigate and challenge the testimony of Walter Britton, a witness who testified that Mr. Menzies had confessed to the killing.

15

The Utah Supreme Court rejected Mr. Menzies's claims, and the federal district court concluded that rejection of these claims was reasonable based on Supreme Court precedent and the record. We agree.

**5.1         Standard for Obtaining Relief Based on Ineffective Assistance of Counsel**

Mr. Menzies's claim of ineffective assistance is governed by the two-part standard established by *Strickland v. Washington*, 466 U.S. 668 (1984).

Under that standard, courts must determine whether the attorneys' performance was deficient. *See Strickland*, 466 U.S. at 687. Performance is deficient when the mistakes are so serious that the attorneys are no longer serving as "counsel" under the Sixth Amendment. *Id.* In determining whether the deficiency rises to this level, the court ordinarily presumes that counsel's performance is reasonable and might entail a sound strategy. *Id.* at 689.

To overcome the presumption of reasonableness, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This inquiry is "highly deferential" and must be made without "the distorting effects of hindsight." *Id.* at 689. Strategic decisions made after a "thorough investigation" are afforded even greater deference and are "virtually unchallengeable." *Id.* at 690.

16

Even if the representation had been deficient, the federal district court must determine whether the deficiency would have been prejudicial. *Id.* at 682. Prejudice exists if there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

When a habeas petitioner alleges ineffective assistance of counsel, courts must engage in doubly deferential judicial review. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Deference rests on both the constitutional standard (from *Strickland*) and the standard for habeas relief. *See id.* ("The question 'is not whether a federal court believes the state court's determination' under *Strickland* 'was incorrect but whether [it] was unreasonable—a substantially higher threshold.'" (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)) (alteration in original)). Given the two layers of deference, a court must consider "whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Ellis v. Raemisch*, 872 F.3d 1064, 1084 (10th Cir. 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (emphasis in *Ellis*)).

## 5.2　　Identification Testimony at Trial

Mr. Larrabee testified at trial that he and his girlfriend had visited the wooded area where Mrs. Hunsaker's corpse was later found. Mr. Larrabee said that while he was at the wooded area, he had seen a man

17

and a woman walking closely together. Mr. Larrabee heard them talking, but could not tell what they were saying.

About ten minutes later, Mr. Larrabee heard a scream. He assumed that the woman had slipped or had seen an animal. About fifteen to twenty minutes after hearing the scream, Mr. Larrabee saw the man returning alone to the parking lot and an older car that looked like it was in poor condition.

### 5.2.1      Photo Arrays

After hearing reports of the discovery of Mrs. Hunsaker's body, Mr. Larrabee contacted the police. A police officer responded by showing Mr. Larrabee a photo array of six subjects. Mr. Larrabee initially didn't pick any of the photographs. But minutes later, he asked to view the photographs again and picked the one of Mr. Menzies, saying that he resembled the man in the wooded area.

### 5.2.2      Identification of Objects

The officers also took Mr. Larrabee to a parking lot and asked him if any of the cars resembled the one he had seen in the wooded area. Mr. Larrabee identified a car that Mr. Menzies had borrowed.

The officers also showed Mr. Larrabee a coat belonging to Mr. Menzies. Mr. Larrabee testified that the coat resembled the one that the man had worn in the wooded area.

18

### 5.2.3 Lineup

Months later, Mr. Larrabee viewed a lineup with eight individuals, including Mr. Menzies. Mr. Larrabee identified another man as the person in the wooded area. So the prosecutor didn't ask Mr. Larrabee on direct examination about the lineup. But on cross-examination, Mr. Larrabee admitted that he had failed to identify Mr. Menzies during the lineup.

To counter that admission, the prosecutor conducted redirect examination. There Mr. Larrabee pointed out that shortly after the lineup, he asked a prosecutor if someone else in the lineup (who was Mr. Menzies) was the suspect.

Mr. Menzies's counsel objected to this testimony and moved for a mistrial. The trial court struck this part of the testimony but declined to grant a mistrial.

### 5.3 The Utah Supreme Court's Disposition of Claims Involving Identification Testimony

In the Utah Supreme Court, Mr. Menzies complained of trial counsel's failure to seek suppression of Mr. Larrabee's testimony about the photo arrays. The Utah Supreme Court rejected this claim based on a failure to show either deficient representation or prejudice. On the issue of deficient representation, the court reasoned that

- Mr. Menzies had failed to present evidence of undue suggestiveness and

19

- trial counsel acted reasonably in pointing out the flaws in Mr. Larrabee's testimony rather than seeking suppression.

*Menzies v. State*, 344 P.3d 581, 616–19 (Utah 2014). The Utah Supreme Court also found no prejudice based on the failure to show a likely difference in the outcome without the testimony on the photo array. *Id.* at 619.

For Mr. Larrabee's identification of Mr. Menzies following the lineup, the Utah Supreme Court observed that the trial court had stricken this part of the testimony. *Id.* at 618.

### 5.4 Mr. Menzies's Challenges to the Utah Supreme Court's Decision

In our court, Mr. Menzies again argues that his trial counsel had failed to (1) argue undue suggestiveness in the photo arrays, lineup, and object identifications, and (2) seek suppression of Mr. Larrabee's identification testimony.

A photo array or lineup should be excluded under the Fourteenth Amendment's Due Process Clause only when the circumstances are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

20

### 5.4.1      The Photo Arrays

Mr. Menzies contends that his trial counsel should have sought exclusion of identification testimony based on undue suggestiveness in the photo arrays.

### 5.4.1.1      Deficiency

The state supreme court reasonably applied federal law and the record when concluding that defense counsel had not acted deficiently in their approach to the photo arrays.

### 5.4.1.1.1      Statement that a Suspect was Already in Custody

In challenging the admissibility of identification from the photo arrays, Mr. Menzies argues that Mr. Larrabee knew that the suspect was already in custody. But the Utah Supreme Court concluded that Mr. Larrabee had viewed the photo arrays before learning that the suspect was in custody. *Menzies v. State*, 344 P.3d 581, 618 (Utah 2014).

This conclusion reflected a reasonable interpretation of the record. In the state post-conviction proceedings, Mr. Menzies argued that the Utah Supreme Court had confused the lineup with the photo arrays, insisting that a law-enforcement officer had told Mr. Larrabee before the photo arrays that a suspect was in custody. *See* Post-Conviction R. at 12,293. This argument conflicts with Mr. Larrabee's sworn statement. There he said that the law-enforcement officer's comment had preceded the lineup, not the photo arrays. Given that sworn statement, the Utah Supreme Court

21

reasonably found that when the photo arrays were conducted, Mr. Larrabee hadn't known that the police had anyone in custody.[2] *Menzies v. State*, 344 P.3d 581, 618 (Utah 2014).

Mr. Menzies does not point to any evidence undermining the Utah Supreme Court's understanding of the timing of the law-enforcement officer's statements. Under that timing, the officer's alleged statement would not have supported suppression of Mr. Larrabee's testimony about the photo arrays.[3]

### 5.4.1.1.2    Second Viewing of the Photo Array

Mr. Menzies also argues that his trial counsel should have challenged the admissibility of Mr. Larrabee's testimony about his second viewing of the photos. According to Mr. Menzies, the second viewing was too suggestive because Mr. Larrabee had examined the photos and couldn't make an identification.

---

[2]    Mr. Menzies also asserts that the "police led Larrabee to believe the suspect was in the photo array." Appellant's Opening Br. at 21. Mr. Menzies provides no citation for this assertion.

[3]    In federal district court, Mr. Larrabee presented a different account: "We [had been] told on more than one occasion by detectives that they had the man responsible in custody, and I assumed that the photos we were shown included the man that was said to be in custody." R. vol. VII, at 26, ¶ 8. We do not consider this account. In reviewing the Utah Supreme Court's decision, we consider only the evidence in the state-court record. *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1731–32 (2022) ("[T]he federal [habeas] court may review the claim based solely on the state-court record.").

Mr. Menzies failed to preserve this argument by omitting it in district court. *See Harris v. Sharp*, 941 F.3d 962, 975 (10th Cir. 2019) ("Even in habeas cases involving the death penalty, we consider arguments forfeited or waived when they are raised for the first time on appeal.").[4]

Mr. Menzies's argument would fail even if he had preserved it in district court. At trial, Mr. Larrabee hadn't made a firm identification from his second look at the photos; he instead had said only that one of the men (Mr. Menzies) looked "most like" the man seen in the wooded area.

When the trial court ruled, it had no precedential opinion in federal or state court addressing the admissibility of this kind of testimony or the effect of reshowing photos after an inability to make an identification.[5] So a fair-minded jurist could justifiably view defense counsel's failure to object as reasonable.

Mr. Menzies points to an out-of-circuit opinion that found undue suggestiveness: *Thomas v. Varner*, 428 F.3d 491, 504 (3d Cir. 2005). Appellant's Opening Br. at 21. There the Third Circuit found trial counsel

---

[4] Mr. Menzies has not urged plain error, so we'd decline to apply the plain-error standard even if we were to classify the issue as forfeited rather than waived. *See Hancock v. Trammell*, 798 F.3d 1002, 1011 (10th Cir. 2015) (declining to consider a forfeited habeas claim because the petitioner had not urged plain error).

[5] Mr. Menzies concedes that defense counsel did not challenge the suggestiveness of the photo arrays. Defense counsel instead objected based on a failure to disclose this identification before the trial. Appellant's Opening Br. at 21–22.

ineffective for failing to move to suppress or object to a suggestive identification after a witness had testified "that he would not have made the identification if the detective had not strongly suggested that the two pictures highlighted were of the perpetrators." *Thomas*, 428 F.3d at 504.

The Utah Supreme Court could reasonably find no similarly suggestive comments here. So the Utah Supreme Court reasonably concluded that Mr. Menzies's counsel had not acted deficiently by declining to seek suppression of the second photo array.

### 5.4.1.1.3    Lack of an Admonition

Mr. Menzies also argues that law-enforcement officers failed to admonish Mr. Larrabee that the photo array might not include the suspect. But the Supreme Court has never required this admonition, and our court hasn't viewed the lack of such an admonition as fatal. *E.g.*, *United States v. Worku*, 800 F.3d 1195, 1204–05 (10th Cir. 2015) (upholding the introduction of identification testimony based on a photo array even though the law-enforcement officers had allegedly failed to provide the witnesses with admonitions required by department policy); *accord United States v. Carr*, 761 F.3d 1068, 1076 (9th Cir. 2014) (concluding that identification testimony wasn't undermined by a police officer's failure to admonish a witness that the photos might not have included pictures of the suspect). Given this precedent, the Utah Supreme Court could reasonably conclude

24

that Mr. Menzies's attorneys hadn't acted deficiently by declining to challenge the lack of an admonition from the police.

### 5.4.1.1.4    False Dichotomy

Mr. Menzies also asserts that the Utah Supreme Court created a false choice between seeking suppression of the identification testimony and impeaching it after it had been allowed into evidence. He bases this assertion on two sentences in the Utah Supreme Court's opinion:

> Mr. Menzies has not raised a genuine issue of material fact regarding trial counsel's decision to impeach Mr. Larrabee's . . . testimony. Trial counsel acted reasonably in pointing out the flaws in the testimony rather than seeking to suppress it on the ground that the police used unnecessarily suggestive tactics.

*Menzies v. State*, 344 P.3d 581, 619 (Utah 2015).

Mr. Menzies takes these sentences out of context. Right before these two sentences, the court had explained at length why it didn't regard the identification testimony as unduly suggestive. *Id.* at 617–19. Based on that explanation, the court stated that it viewed Mr. Menzies's challenges as attacks on "the weight," rather than the admissibility, of the identification testimony. *Id.* at 618. The court did not suggest that defense counsel had to choose between a pretrial motion to suppress and impeachment at trial. We thus reject Mr. Menzies's assertion that the Utah Supreme Court had relied on a false choice between a motion to suppress and impeachment at trial.

### 5.4.1.2.    Prejudice

The Utah Supreme Court also acted reasonably in concluding that Mr. Menzies had not established prejudice. In a single sentence, Mr. Menzies asserts that the result of the trial would have been different if the trial court had suppressed evidence from the photo array.

According to Mr. Menzies, the only evidence tying him to the crime scene was Mr. Larrabee's testimony. But Mr. Menzies disregards much of the evidence tying Mr. Menzies to the murder. *See Menzies v. State*, 344 P.3d 581, 591 (Utah 2014) (discussing "numerous pieces of evidence indicating that Mr. Menzies killed Mrs. Hunsaker").

In any event, the Utah Supreme Court needed to address prejudice in light of the argument that Mr. Menzies had presented. *See Green v. Louder*, 29 P.3d 638, 647 (Utah 2001) (stating that the court would not assume the appellant's burden of arguing and researching an appellant's contention). He argued only that the defense attorney had a "good chance" of persuading the trial court to strike the testimony of Mr. Larrabee, whom Mr. Menzies called the State's "star witness." Appellant's Opening Br. at 97, *Menzies v. State*, No. 20120290-SC (Utah Feb. 14, 2013). The Utah Supreme Court rejected this conclusory assertion of prejudice, observing that Mr. Menzies had just "restate[d] the basic prejudice standard and provide[d] no analysis regarding why" he thought that an objection stood a

26

"good chance" of succeeding. *Menzies v. State*, 344 P.3d 581, 619 (Utah 2014).

Even now, Mr. Menzies does not say what was wrong with the Utah Supreme Court's reasoning on prejudice. Given that failure, we are hard-pressed to question the reasonableness of the court's decision on prejudice. *See Wellmon v. Colo. Dep't of Corrs.*, 952 F.3d 1242, 1249 (10th Cir. 2020) (concluding that we review the reasonableness of a state court's decision "in light of the arguments" that the petitioner had presented in state court).

### 5.4.2    The Lineup

Mr. Menzies also argues that his counsel should have moved to suppress Mr. Larrabee's testimony that he had asked after the lineup if Mr. Menzies was the suspect. Mr. Menzies contends that the lineup was impermissibly suggestive because (1) his shirt was much darker than the other men's shirts, (2) irregularities in the photo array had contaminated the lineup, and (3) an officer had told Mr. Larrabee that the suspect had recently gained or lost 20 pounds.

Mr. Menzies failed to preserve these contentions by omitting them from the habeas petition. *See Harris v. Sharp*, 941 F.3d 962, 975 (10th Cir. 2019) ("Even in habeas cases involving the death penalty, we consider arguments forfeited or waived when they are raised for the first time on appeal."). Mr. Menzies doesn't deny the omission of these allegations from

27

his habeas petition. He instead says that (1) he alleged irregularities in the lineup and (2) "the lineup photo was part of the state court record." Appellant's Reply Br. at 4. But the district court had no duty to scour the state-court record in search of a habeas theory. So Mr. Menzies waived or forfeited these contentions by omitting them in his habeas petition.

Even if Mr. Menzies had not waived or forfeited these contentions, we'd reject them because the trial court struck the testimony about the lineup and told the jury to disregard this testimony. *See Williams v. Bagley*, 380 F.3d 932, 975 (6th Cir. 2004) (concluding that a habeas petitioner had failed to show prejudice on a claim of ineffective assistance because the trial court had instructed the jury to disregard the testimony). We ordinarily presume that jurors follow instructions, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and Mr. Menzies doesn't say why we should reject that presumption here. With no such reason, we conclude that the Utah Supreme Court acted reasonably in rejecting Mr. Menzies's conclusory assertion of prejudice.

### 5.4.3    The Identification of Objects

Mr. Menzies also claims deficiencies in his trial counsel's failure to seek suppression of Mr. Larrabee's testimony identifying

- the car that he had seen in the parking lot and

- the coat that Mr. Menzies had worn.

Mr. Menzies points out that

- there were only one or two older cars in the parking lot (where Mr. Larrabee had pointed to the car owned by Mr. Menzies's friend) and

- a detective had shown Mr. Larrabee only a single coat.

In the Utah Supreme Court, Mr. Menzies argued that officers had used unduly suggestive procedures to obtain Mr. Larrabee's identification of the car and the coat. The Utah Supreme Court rejected this argument without discussing this part of the testimony. *Menzies v. State*, 344 P.3d 581, 618 (Utah 2014). We review the reasonableness of the Utah Supreme Court's decision based on the arguments presented. *See Wellmon v. Colo. Dep't of Corrs.*, 952 F.3d 1242, 1249 (10th Cir. 2020) ("[U]nder Section 2254(d), we review the reasonableness of a state court's decision in light of the arguments the petitioner raised in the state court.").

In his post-conviction appeal, Mr. Menzies questioned identification of the car only once. That reference consisted of two sentences in a footnote in the statement of facts:

> The police may use suggestive identification procedures relating to physical evidence to frame a suspect. *Johnson v. Sublett*, 63 F.3d 926, 932 (9th Cir. 1995)). This happened here as there were only two or three older cars in the lot, and they did not look like [the car that had been loaned to Mr. Menzies].

Appellant's Opening Br. at 11 n.16, *Menzies v. State*, No. 20120290-SC (Utah Feb. 14, 2013). The Utah Supreme Court doesn't typically consider arguments when they appear only in a statement of facts or in a footnote.

29

*E.g.*, *Pohl, Inc. of Am. v. Webelhuth*, 201 P.3d 944, 952–53 (Utah 2008) (failure to develop an argument beyond the statement of facts); *Anderson v. Taylor*, 149 P.3d 352, 359 (Utah 2006) (declining to consider a request consisting of two conclusory sentences in a footnote); *see also Allen v. Friel*, 194 P.3d 903, 907–08 (Utah 2008) (stating that a brief is inadequate when it cites authority without developing or analyzing it based on that authority).

But let's assume, for the sake of argument, that Mr. Menzies adequately developed this argument about identification of the car. In the Utah Supreme Court, Mr. Menzies cited only a single Ninth Circuit opinion. Even there, the Ninth Circuit had *rejected* a habeas petitioner's challenge to testimony involving identification of a car. *Johnson v. Sublett*, 63 F.3d 926, 931–32 (9th Cir. 1995). Mr. Menzies supplied the Utah Supreme Court with no other legal authority for his challenge to the testimony identifying his car. Mr. Menzies also failed to support his challenge with any factual basis, stating only that the police had

- taken Mr. Larrabee to see vehicles parked in the police lot and

- these vehicles included Mr. Menzies's "beat up 1974 Chevy . . . with a distinguishing dent to the front hood."

Appellant's Opening Br. at 11, *Menzies v. State*, No. 20120290-SC (Utah Feb. 14, 2013). Given the cursory legal and factual references, the Utah Supreme Court acted reasonably in summarily rejecting Mr. Menzies's

30

challenge as to the car. *See Wellmon v. Colo. Dep't of Corrs.*, 952 F.3d 1242, 1249 (10th Cir. 2020).

Mr. Menzies also challenges testimony identifying a coat that he had allegedly worn in the wooded area. For this challenge, Mr. Menzies points out that

- the police showed Mr. Larrabee only a single coat and

- that coat didn't match Mr. Larrabee's earlier description.

To resolve this challenge, we consider the reasonableness of the Utah Supreme Court's "decision in light of the arguments the petitioner raised in the state court." *Id.*

In the post-conviction appeal, Mr. Menzies's argument consisted of this sentence, which lacked any citation to the record or to case law: "The jacket show ups were suggestive in that they did not require Larrabee . . . to select Appellant's jacket from an array of similar jackets." Appellant's Opening Br. at 98, *Menzies v. State*, No. 20120290-SC (Utah Feb. 14, 2013). This sentence provided the Utah Supreme Court with no legal support for his challenge.

Nor was there a basis in the case law, for various circuits had held that due process did not require displays of similar objects before allowing testimony identifying an object. *See Johnson v. Sublett*, 63 F.3d 926, 932 (9th Cir. 1995) ("There is no authority holding that a defendant's due

31

process right to reliable identification procedures extends beyond normal authenticity and identification procedures for physical evidence offered by the prosecution."); *see also Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) ("[I]dentification of clothing is not a procedure so inherently 'conducive to irreparable mistaken identification' as to provide the basis for a denial of due process." (quoting *Foster v. California*, 394 U.S. 440, 442 (1969))); *Inge v. Procunier*, 758 F.2d 1010, 1015 (4th Cir. 1985) (stating that identification of a truck isn't "governed by the constitutional limitations that control the identification of a defendant"). With no legal basis to question the admissibility of Mr. Larrabee's testimony, the Utah Supreme Court acted reasonably in rejecting the challenge.

We thus conclude that the Utah Supreme Court acted reasonably in rejecting Mr. Menzies's theories of ineffective assistance as to Mr. Larrabee's identification testimony.[6]

---

[6]    In a single sentence, Mr. Menzies also asserts that the Utah Supreme Court failed to consider the pertinent factors bearing on the constitutionality of the identification testimony. Appellant's Opening Br. at 27–28. This assertion is mistaken. The court identified these factors and discussed them at length. *Menzies v. State*, 344 P.3d 581, 617–19 (Utah 2014).

### 5.4.4    Failure to Investigate the Account of Mr. Larrabee and His Girlfriend

Mr. Menzies also argues that his trial counsel should have interviewed Mr. Larrabee and his girlfriend. For this argument, Mr. Menzies relies on an affidavit from Mr. Larrabee, which stated two points:

1.    On the day that I sighted the couple hiking at Storm Mountain, I went there to be alone with my girlfriend . . . . I was primarily interested in having private time with her, and I was focused on this amorous time I had spent with her. [She] and I were kissing on a picnic table after the time that the couple had disappeared from our view.

2.    When the male hiker was walking in the direction of the parking lot by himself some time later (1) [my girlfriend's] back was towards the male hiker; (2) I was watching the male hiker to ensure that he had left the area so that I could enjoy being with [my girlfriend] without her being concerned; (3) there were various shrubs and trees obstructing my line of vision when I was observing the male hiker head towards the parking lot; (4) the distance between myself and the male hiker as he was walking in the direction of the parking lot was between fifty and 100 yards; (5) because of the positions of myself and the male hiker, I could not see his face squarely as he headed in the direction of the parking lot; and (6) the only part of the hiker's head that I could see was his back, and his right profile.

Post-Conviction R. at 12,293. According to Mr. Menzies, his trial attorney should have elicited Mr. Larrabee's focus on his girlfriend rather than the nearby hiker. The Utah Supreme Court rejected this claim, concluding that the attorney had not acted deficiently or prejudicially by failing to interview Mr. Larrabee and his girlfriend. *Menzies v. State*, 344 P.3d 581, 617 (Utah 2014).

33

For this conclusion, the court pointed to three considerations. First, Mr. Menzies's counsel had cross-examined these witnesses and highlighted the weaknesses of their testimony. *Id.* Second, "Mr. Menzies d[id] not explain how the jury knowing that Mr. Larrabee's attention was directed at [his girlfriend] *for the purpose of having sexual relations* would have changed the outcome of the case." *Id.* (emphasis in original). Finally, the jury might have concluded that Mr. Larrabee's concern over being seen with his girlfriend would have sharpened his attention to others in the area. *Id.*

In our appeal, Mr. Menzies challenges the reasonableness of the Utah Supreme Court's determinations, arguing factually that Mr. Larrabee's affidavit undermines his identification testimony. In our view, however, the court was making a legal conclusion (rather than a factual finding) on the significance of the new information. *See Wood v. Carpenter*, 907 F.3d 1279, 1291 (10th Cir. 2018) (holding that an assessment of the strength of the evidence is a legal determination).[7]

The Utah Supreme Court acted reasonably in characterizing the entirety of Mr. Larrabee's account. The affidavit states that he was

---

[7]    Mr. Menzies contends that *Wood* mischaracterized a Supreme Court opinion (*Williams v. Taylor*, 529 U.S. 362 (2000)). But we are bound by *Wood* irrespective of its correctness. *See United States v. Walling*, 936 F.2d 469, 472 (10th Cir. 1991) ("One panel of the court cannot overrule circuit precedent.").

"watching the hiker to ensure that he had left the area." Post-Conviction R. at 12,293. This statement could reasonably suggest that Mr. Larrabee was focused on the hiker, and this focus on the hiker might have triggered memory of details. So the Utah Supreme Court reasonably concluded that Mr. Menzies's trial counsel hadn't acted prejudicially in failing to interview Mr. Larrabee.[8]

### 5.5        Failure to Challenge the Testimony of Walter Britton

Mr. Menzies's final challenge to his trial counsel's performance involves the testimony of Walter Britton, a fellow inmate at the jail. In the preliminary hearing, Mr. Britton testified that Mr. Menzies had

- admitted killing Mrs. Hunsaker and

- acknowledged a great thrill from cutting her throat.

Mr. Britton refused to testify at trial, and the prosecution used his testimony from the preliminary hearing.

During the post-conviction proceedings, Mr. Menzies submitted an affidavit from Mr. Britton, which recanted some of his testimony about the confession. *See* Post-Conviction R. at 12,246. For example, Mr. Britton denied that Mr. Menzies had acknowledged a thrill from cutting Mrs. Hunsaker's throat, adding: "It is possible that Mr. Menzies may not have

---

[8]    Mr. Menzies also says that his attorney should have interviewed the girlfriend. But Mr. Menzies doesn't say what the girlfriend would have added.

35

admitted to me that he had killed the victim. I believe that I may have told the police and the court that because I was scared, and facing a lot of prison time on the federal charges." *Id.* Finally, Mr. Britton stated that he was taking anxiety medication when he talked to Mr. Menzies: "I felt like I was in a fog . . . and for this additional reason, my statements . . . may have been inaccurate." *Id.*

Mr. Menzies asserts that his trial counsel should have

- discovered evidence of Mr. Britton's mental illness and impeached him with it,

- discovered the benefits that Mr. Britton received from his testimony and impeached him with those benefits, and

- interviewed an inmate (George Benitez), who stated that Mr. Britton had described a plan to fabricate testimony about Mr. Menzies in order to obtain a milder sentence.

### 5.5.1　The Utah Supreme Court's Disposition of the Claim

The Utah Supreme Court rejected Mr. Menzies's first two assertions.

For the assertion about Mr. Britton's mental illness, the Utah Supreme Court concluded that defense counsel had conducted a reasonable investigation. The attorney had subpoenaed the federal court for mental health records but received no responsive documents. In the Utah Supreme Court's view, the failure to take additional measures to impeach Mr. Britton with mental health evidence was neither deficient nor prejudicial. *Menzies v. State,* 344 P.3d 81, 615–16 (Utah 2014).

36

For the assertion involving benefits from testifying, the court observed that Mr. Menzies's trial counsel had used the relevant information to challenge Mr. Britton's credibility: "[Trial] counsel highlighted the weakness of Mr. Britton's testimony [at the preliminary hearing] by showing that he was eager to testify against Mr. Menzies when he thought he might benefit by doing so, but he stopped cooperating once he realized that benefit would not materialize." *Id.* at 616.

The Utah Supreme Court did not address the claim involving Mr. Benitez's account because Mr. Menzies had not raised that claim in the state proceedings.

### 5.5.2        Mental-Health Evidence

Mr. Menzies argues that his attorney should have impeached Mr. Britton with evidence of his mental illness. The evidence appeared in (1) a letter by a psychiatrist, Dr. Breck Lebegue, who had interviewed Mr. Britton to address his competency to stand trial and (2) a report involving Mr. Britton's competency.[9]

In the habeas appeal, Mr. Menzies relies primarily on Dr. Lebegue's letter. Defense counsel had offered the letter into evidence. But the trial

---

[9]    Three other pieces of evidence suggested that Mr. Britton may have been mentally ill: (1) the docket in Mr. Britton's criminal case contained a motion for determination of mental capacity; (2) Mr. Britton acknowledged that he had undergone a mental health evaluation; and (3) Mr. Menzies had told his attorneys that Mr. Britton was mentally ill. But Mr. Menzies focuses on Dr. Lebegue's letter.

court excluded the letter because it constituted inadmissible hearsay.

Despite that ruling, defense counsel could have

- subpoenaed Dr. Lebegue to testify about the contents of his letter or

- cross-examined Mr. Britton with the letter.

Defense counsel bypassed these opportunities, and Mr. Menzies criticizes this decision.

In Utah, the party seeking to admit evidence of mental illness must "show that it actually affects the witness's credibility." *State v. Stewart*, 925 P.2d 598, 601 n.2 (Utah Ct. App. 1996). This showing requires a demonstration that the mental illness "affects the witness's ability to accurately perceive, recall, and relate events" because "[not] all mental disorders affect a person's credibility." *Id.* at 600.

Mr. Menzies argues that Mr. Britton's mental illness diminished his credibility, focusing primarily on Dr. Lebegue's letter. For this argument, Mr. Menzies points out that the Utah Supreme Court never discussed the failure to call Dr. Lebegue as a witness. In assessing this criticism, we consider the arguments presented in the post-conviction appeal. *See Wellmon v. Colo. Dep't of Corrs.*, 952 F.3d 1242, 1249 (10th Cir. 2020).

There Mr. Menzies referred to this allegation in just a single sentence, stating that he'd alleged defense counsel's failure to "subpoena Britton's psychiatrist for trial." Appellant's Opening Br. at 86, *Menzies v.*

38

*State*, No. 20120290-SC (Utah Feb. 14, 2013). Mr. Menzies never told the Utah Supreme Court what Dr. Lebegue had said in his letter or would have testified.[10] Given that omission, the Utah Supreme Court acted reasonably in declining to discuss a claim involving his letter.

The letter itself provided little reason for defense counsel to call Dr. Lebegue as a witness. In the letter, Dr. Lebegue explained that he couldn't "derive an opinion" on Mr. Britton's mental state because the interview had lasted only 30 minutes. Given Dr. Lebegue's inability to derive an opinion, why call him as a witness?

In his reply brief, Mr. Menzies states that Dr. Lebegue found that Mr. Britton could not rationally cooperate with his attorney. This statement misinterprets Dr. Lebegue's letter. In the letter, Dr. Lebegue explains that he

- was asked to render an opinion on Mr. Britton's ability "to understand the proceedings . . . or to assist in his defense," and

- could not "derive an opinion as to the defendant's mental state."

Post-Conviction R. at 11,538. Because Dr. Lebegue couldn't derive an opinion, he recognized that Mr. Britton "may" lack the ability to cooperate with his attorney. *Id.* at 11,539.

---

[10]   Mr. Menzies did cite the letter, but only when stating the reason for Dr. Lebegue's psychiatric evaluation—not for anything that the doctor had said.

Mr. Menzies omits the word "may"; Dr. Lebegue never expressed an opinion on Mr. Britton's inability to assist his attorney. Given the qualifier "may," a fair-minded jurist could reasonably conclude that this possibility wouldn't affect Mr. Britton's ability to accurately perceive, recall, and relate events.

Dr. Lebegue's letter could thus support trial counsel's decision to forgo testimony about Mr. Britton's mental health. Rather than suggest affliction with a mental illness, trial counsel developed a strategy involving Mr. Britton's effort to soften his own sentence. Advancing this strategy, Mr. Menzies's attorney argued that Mr. Britton had accurately recalled the news reports about the murder and used them to fabricate Mr. Menzies's confession in order to obtain favorable treatment. *See* Original Trial Tr. at 2671 (arguing that Mr. Britton "had access to all television reports concerning [Mrs.] Hunsaker").

An argument about mental illness could have sunk this strategy by undermining Mr. Britton's ability to understand his own self-interest. So the Utah Supreme Court appropriately concluded that defense counsel had acted reasonably in declining to challenge Mr. Britton's testimony with evidence of his mental illness.

### 5.5.3    Benefits from Testimony

Mr. Menzies argues that his trial counsel should have obtained additional evidence of bias to enhance the cross-examination at his

40

preliminary hearing. The additional evidence concerned Mr. Britton's cooperation with the prosecutors in Mr. Menzies's case.

The Utah Supreme Court addressed this contention, concluding that the attorney's investigation was not deficient or prejudicial. This conclusion reflected a reasonable application of Supreme Court precedent and the evidence because the attorney had

- elicited substantial testimony about Mr. Britton's motive to help the prosecution and

- presented new trial evidence involving Mr. Britton's benefit from helping the prosecution.

At the preliminary hearing, the attorney cross-examined Mr. Britton, who admitted convictions for bank robberies, stealing, and presenting a forged instrument. Mr. Britton also admitted that he was awaiting his sentencing in one of the robbery cases.

The prosecution countered by arguing that Mr. Britton had learned the grisly details from the murderer himself. To rebut that argument, Mr. Menzies's attorney elicited Mr. Britton's admission in the preliminary hearing that he had (1) heard news reports about the murder and (2) waited roughly a month before reporting the purported confession.

At trial, the attorney couldn't question Mr. Britton further because he refused to testify again. So the attorney presented new testimony from the

41

lawyer who had represented Mr. Britton in one of the robbery cases. The lawyer testified that

- Mr. Britton had obtained a hearing on a motion to reduce his sentence and

- a prosecutor from the Menzies case had supported Mr. Britton's motion by reporting to the judge that Mr. Britton had testified for the State.[11]

Given the cross-examination and new evidence at trial, the Utah Supreme Court could reasonably decline to find a deficiency or prejudice in defense counsel's method of challenging Mr. Britton's testimony.

Mr. Menzies points out that his attorney didn't confront Mr. Britton at the preliminary hearing with the prosecutor's promise to report the cooperation to Mr. Britton's sentencing judge. But a fair-minded jurist could regard the attorney's approach as equally effective, for the jury ultimately learned of the arrangement from the new trial evidence. And the Utah Supreme Court could still reasonably conclude that using the statement for additional impeachment would not have dampened Mr.

---

[11]    In closing argument, Mr. Menzies's attorney referred to the impeachment of Mr. Britton, telling the jury that Mr. Britton had benefited from the testimony implicating Mr. Menzies: "[W]hat Mr. Britton got for his testimony here [in Mr. Menzies's murder case] . . . was an appearance by [the prosecutor] . . . at a [federal court] hearing in which it was presented to the judge that Mr. Britton was a cooperative person, that he had helped the police. That was used to reduce his sentence or for the judge to maintain jurisdiction over him so that hopefully, something could be done down the line." Original Trial Tr. at 2670–71.

Britton's credibility. After all, Mr. Menzies's counsel had already obtained admissions from Mr. Britton that he (1) was a felon awaiting sentencing for robbery and (2) had a prior conviction of forgery.

### 5.5.4    Mr. Benitez's Statement

Mr. Menzies argues that his counsel was deficient for failing to conduct a pretrial interview of Mr. George Benitez. Mr. Benitez was an inmate housed at the same jail. Mr. Menzies suggests that an interview would have revealed Mr. Britton's plan to testify about a fabricated confession. The district court concluded that the claim was procedurally barred. We agree.

### 5.5.4.1    Procedural Default

In a declaration filed in federal district court, Mr. Benitez admits that he falsely reported to law-enforcement officers that Mr. Menzies had confessed to killing a woman. *See* R. vol. VII, at 36–38. The declaration adds that Mr. Britton had told Mr. Benitez about a plan to obtain leniency by fabricating testimony implicating Mr. Menzies in a murder. *Id.* at 37. Mr. Benitez explains that he had given the false statement about a confession because he was young and scared and had been promised leniency in a pending case. *Id.* at 36.

In the state-court proceedings, Mr. Menzies did not present a claim involving trial counsel's failure to interview Mr. Benitez. *See* R. vol. II, at 142 (stating that "[t]his claim was not raised in state court"). In the federal

43

habeas petition, Mr. Menzies acknowledged that the claim would be defaulted unless he could show cause and prejudice. *See id*.

Mr. Menzies sought to establish cause and prejudice based on the ineffectiveness of his post-conviction attorney. According to the habeas petition, Mr. Menzies's post-conviction counsel "fell below the standards of a minimally competent capital post-conviction attorney when he failed to raise this meritorious claim." *Id*. Given the ineffectiveness of post-conviction counsel, Mr. Menzies relied on *Martinez v. Ryan*, 566 U.S. 1 (2012).

Applying *Martinez*, the federal district court held that the claim involving Mr. Benitez was procedurally barred. The court rejected Mr. Menzies's argument that under *Martinez*, the ineffective assistance of his post-conviction attorney could overcome the procedural bar: "[I]n *Davila v. Davis*, 137 S. Ct. 2058 (2017), the Supreme Court made clear that *Martinez* will not be extended to claims of ineffective assistance of post-conviction counsel for failing to raise the ineffective assistance of appellate counsel claims." R. vol. I, at 1234–35. So Mr. Menzies was procedurally barred from raising "anything to do with the failure to investigate . . . Benitez." *Id*. at 1235.

Mr. Menzies challenges the district court's finding of a procedural bar. For this challenge, he contends that the district court erred in applying *Davila v. Davis*, 137 S. Ct. 2058 (2017) to reject his *Martinez* argument.

44

As Mr. Menzies argues, the district court did misapply *Davila*. Mr. Menzies claimed ineffective assistance of *trial* counsel, and *Davila* had addressed "a different kind of defaulted claim—ineffective assistance of *appellate* counsel." 137 S. Ct. at 2063 (emphasis added). For claims of ineffective assistance of trial counsel, we may assume for the sake of argument that *Martinez* applies. *See Martinez v. Ryan*, 566 U.S. 1, 8 (2012) ("Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.").

Under *Martinez*, a petitioner may show cause to overcome a procedural default when

- a state requires assertion of an ineffective assistance of counsel claim in a collateral proceeding rather than on direct appeal and

- the petitioner has obtained ineffective assistance in the collateral proceeding.

*See Finlayson v. State*, 6 F.4th 1235, 1243 (10th Cir. 2021) (discussing *Martinez*). We assume (without deciding) that Mr. Menzies has satisfied the first *Martinez* requirement, but conclude that he cannot satisfy the second one.

For the first *Martinez* requirement, Mr. Menzies argues that he could not have brought an ineffective assistance claim on direct appeal in the Utah courts because

45

- Utah law did not allow him to raise these claims when he filed his opening brief on direct appeal and

- Mr. Menzies's trial counsel also represented him on direct appeal.

A Utah rule currently allows parties in a direct appeal to claim ineffective assistance of trial counsel. But Mr. Menzies had filed his opening appellate brief before this rule took effect. S*ee* Utah R. App. P. 23B (eff. Oct. 1, 1992). Prior to this rule, Mr. Menzies could not have raised these claims in the direct appeal. *See State v. Litherland*, 12 P.3d 92, 97–98 (Utah 2000) (discussing the "pre-rule 23B regime").

And Utah law *allows* post-conviction petitioners to assert new claims of ineffective assistance of counsel if trial counsel has also represented the petitioner in the direct appeal. *See Rudolph v. Galetka*, 43 P.3d 467, 468–69 (Utah 2002). Here some of the same attorneys had represented Mr. Menzies at trial and on appeal. So we may assume satisfaction of the first *Martinez* requirement.

But Mr. Menzies falters on the second *Martinez* requirement. His post-conviction attorney wasn't ineffective by declining to challenge trial counsel's failure to interview Mr. Benitez.

In considering the attorneys' performance, we assess both parts of the standard for ineffective assistance of counsel: deficient performance

46

and prejudice. *Davis v. Sharp*, 943 F.3d 1290, 1299 (10th Cir. 2019). Both are lacking here.

For deficient performance, Mr. Menzies must show that his post-conviction attorneys were ineffective in neglecting to raise a claim involving the failure to interview Mr. Benitez. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984) ("When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."). But trial counsel need "not interview every possible witness to have performed proficiently." *Young v. Sirmons*, 486 F.3d 655, 680 (10th Cir. 2007) (quoting *Owens v. United States*, 483 F.3d 48, 69 (1st Cir. 2007)). When other sources of information exist, we have regarded trial counsel's decision not to interview a particular witness as a reasonable exercise of professional judgment. *See United States v. Snyder*, 787 F.2d 1429, 1433 (10th Cir. 1986); *accord Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986) ("A claim of failure to interview a witness . . . cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." (quoting *United States v. Decoster*, 624 F.2d 196, 209 (D.C. Cir. 1976) (en banc))).

We consider the reasonableness of the attorney's judgment based on Mr. Benitez's statement, which reported Mr. Menzies's confession in 1986. Mr. Menzies acknowledges that the statement was mentioned in police

reports. *See* R. vol. II, at 142 ("Police reports clearly indicated that Benitez was interviewed by police about statements made by Mr. Menzies."). Mr. Menzies's attorneys could reasonably exercise their professional judgment by relying on Mr. Benitez's account in the police report. *See Williams v. Lemmon*, 557 F.3d 534, 539 (7th Cir. 2009) (per curiam) ("[T]his court has held that no constitutional rule forbids lawyers from relying on interviews conducted by the police when deciding whether additional inquiries are in order.").

Mr. Menzies has also neglected to show prejudice from his trial counsel's failure to interview Mr. Benitez. To establish prejudice, Mr. Menzies must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 669 (1984). A reasonable probability of a different result is lacking here.

Mr. Benitez waited 28 years before retracting the 1986 statement,[12] and Mr. Menzies presents no reason to think that Mr. Benitez would have

---

[12]    The State argues that Mr. Menzies could not use the declaration because it was not part of the state-court record. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). Mr. Menzies does not reply to this argument. But he apparently assumes that he could use the declaration to show cause for a procedural default. Because Mr. Benitez's declaration doesn't establish ineffectiveness of post-conviction counsel, we need not decide whether a newly submitted declaration could prevent a procedural default. *Cf. Shinn v. Ramirez*, 142 S. Ct. 1718, 1737–38 (2022) (discussing the applicability

retracted the statement 28 years earlier if trial counsel had conducted a pretrial interview. And the case against Mr. Menzies included substantial evidence other than statements made to fellow jail inmates. *See State v. Menzies*, 889 P.2d 393, 401 (Utah 1994) (observing that there was "substantial evidence linking Menzies to the homicide"). So even if trial counsel had interviewed Mr. Benitez and obtained a retraction, Mr. Menzies has not established a reasonable probability of an acquittal.

We conclude that Mr. Menzies has not overcome the procedural bar from failing to raise the Benitez claim in state court.[13]

---

of statutory restrictions on evidentiary hearings to new evidence of cause based on ineffectiveness of post-conviction counsel).

[13]    The State observes that Mr. Menzies brought a separate claim for ineffectiveness of his counsel in the state post-conviction proceedings. *See* R. vol. II, at 281–310 (Second Amended Petition for Writ of Habeas Corpus, Claim 38). Mr. Menzies has no certificate of appealability on this claim.

But Mr. Menzies also challenges his trial counsel's failure to interview Mr. Benitez. *See id*. at 142–44. In that claim, Mr. Menzies asserts that "[t]he ineffective assistance of Mr. Menzies's state post-conviction counsel in failing to raise this claim constitutes cause for the default and resulted in prejudice to Mr. Menzies." *Id.* at 142.

The district court granted a certificate of appealability on the entirety of Mr. Menzies's claim for ineffective assistance of trial counsel, which included the challenges involving Mr. Benitez. *See* R. vol I, at 1307. So we have jurisdiction to consider Mr. Menzies's challenges involving his post-conviction counsel's failure to raise a claim on trial counsel's decision not to interview Mr. Benitez.

### 5.5.4.2    Merits

The claim involving Mr. Benitez's declaration also fails on the merits.

In addressing the issue, we lack a discussion of the merits not only in district court but also in the Utah Supreme Court. Because the Utah Supreme Court did not decide this claim on the merits, Mr. Menzies need not show a failure to reasonably apply Supreme Court precedent. *See Cook v. McCune*, 323 F.3d 825, 830 (10th Cir. 2003) ("When state courts have not adjudicated a petitioner's claim on the merits, the AEDPA standards do not apply . . . ."). But Mr. Menzies does bear the burden of showing a right to habeas relief based on a preponderance of the evidence. *Beeler v. Crouse*, 332 F.2d 783, 783 (10th Cir. 1984) (per curiam). In our view, Mr. Menzies did not show by a preponderance of the evidence that trial counsel's representation was either deficient or prejudicial.

Mr. Menzies bases this habeas claim on a declaration that Mr. Benitez signed roughly 28 years after the trial. In the declaration, Mr. Benitez said that Mr. Britton had acknowledged a plan to fabricate Mr. Menzies's confession. In the same declaration, however, Mr. Benitez acknowledged that before the trial, he too had told the police that he'd heard Mr. Menzies confess. In the declaration, Mr. Benitez explained that

- he had talked to law-enforcement officers at the encouragement of Mr. Britton and

50

- Mr. Benitez had been young and scared and had told law-enforcement officers that he heard Mr. Menzies confess to the murder.

Though Mr. Benitez recanted decades later, he does not suggest that he would have told a different story to defense counsel before the trial. After all, Mr. Benitez was young and scared before the trial and would have had to admit that he and Mr. Britton had lied to law-enforcement officers. Given Mr. Britton's own incriminating report to law-enforcement officers, we conclude that Mr. Menzies did not show by a preponderance of the evidence that the failure to interview Mr. Benitez had been either deficient or prejudicial. We thus reject this claim of ineffective assistance.

\* \* \*

In summary, we reject the claims of ineffective assistance of trial counsel.

**6. The trial court's instruction on reasonable doubt constituted a reasonable application of Supreme Court precedent and conformed to the Constitution.**

Mr. Menzies also challenges the jury instruction on reasonable doubt. For this challenge, Mr. Menzies focuses on the last paragraph of the instruction:

> If after an impartial consideration and comparison of all the evidence in the case you can candidly say that you are not satisfied of the defendant's guilt, you have a reasonable doubt. But if after such impartial consideration and comparison of all the evidence you can truthfully say that you have an abiding

51

conviction of the defendant's guilt such as you will be willing to act upon in the more weighty and important matters relating to your own affairs, you have no reasonable doubt. A reasonable doubt must be a real, substantial doubt and not one that is merely possible or imaginary.

Trial ROA Dkt. No. 857.

Mr. Menzies claims that this instruction improperly dampened the prosecution's burden of proving the crime beyond a reasonable doubt, pointing to the statements that

- reasonable doubt must be "real" and "substantial" and "not one that is merely possible or imaginary" and

- reasonable doubt is lacking if one has "an abiding conviction of the defendant's guilt such as [the jury] will be willing to act upon in the more weighty and important matters relating to [the jury's] own affairs."

*Id.*

## 6.1     Reasonableness of the Utah Supreme Court's Decision

The Utah Supreme Court summarily rejected these claims. *State v. Menzies*, 889 P.2d 393, 406 (Utah 1994). So we must independently review the record and federal law to determine whether the Utah Supreme Court's result "contravenes or unreasonably applies clearly established federal law" according to the Supreme Court. *Aycox v. Little*, 196 F.3d 1174, 1178 (10th Cir. 1999).

### 6.1.1        Substantial Doubt

Mr. Menzies argues that the jury instruction incorrectly distinguished between doubts that are substantial and merely possible or imaginary. For this argument, Mr. Menzies relies on *Cage v. Louisiana*, 498 U.S. 39 (1990) (per curiam), and *Monk v. Zelez*, 901 F.2d 885(10th Cir. 1990) (per curiam). In *Cage*, the Supreme Court found error in a jury instruction that had equated reasonable doubt with (1) "such doubt as would give rise to a grave uncertainty" and (2) "an actual substantial doubt" rather than "a mere possible doubt." 498 U.S. at 40–41. In *Monk*, we found error in an instruction's description of reasonable doubt as "a substantial honest, conscientious doubt." 901 F.2d at 889–91.[14]

After *Cage* and *Monk*, however, the Supreme Court addressed a similar issue in *Victor v. Nebraska*, 511 U.S. 1 (1994). There the Court "made it clear that *Cage* was a narrow decision." *Wansing v. Hargett*, 341 F.3d 1207, 1213 (10th Cir. 2003) (discussing *Victor*). In *Victor*, the trial court instructed the jury that a reasonable doubt "is an actual and

---

[14]    *Monk* was our case, not the Supreme Court's. Under 28 U.S.C. § 2254(d)(1), the district court must focus on precedent by the Supreme Court, not our court. *See Carter v. Ward*, 347 F.3d 860, 863 (10th Cir. 2003) (stating that "an absolute prerequisite for petitioner's claim is that the asserted constitutional right on which it rests derive in clear fashion from Supreme Court precedent"). So a petitioner cannot satisfy § 2254(d)(1) based on a departure from our opinion in *Monk. See Welch v. City of Pratt*, 214 F.3d 1219, 1223 (10th Cir. 2000) (concluding that the petitioner's claim couldn't satisfy § 2254(d)(1) because it rested on our opinion rather than the Supreme Court's).

substantial doubt," but not "a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." 511 U.S. at 18.

The Supreme Court commented that the reference to "substantial doubt" was "somewhat problematic," but viewed the rest of the instruction as adequate because it clarified that a doubt was insubstantial only if it involved a "mere possibility," "bare imagination," or "fanciful conjecture." *Id.* at 19–20. That clarification hadn't existed in *Cage*'s jury instruction. *Id.* at 20. In *Victor*, the instruction explained that "'substantial' is used in the sense of the existence rather than magnitude of the doubt." *Id.* So the *Victor* jury had been properly instructed. *Id.* at 20–21.

Under *Victor*, the Utah Supreme Court reasonably rejected Mr. Menzies's challenge to the instruction's use of the phrase "a real, substantial doubt." Like the jury instruction in *Victor*, the jury instruction at Mr. Menzies's trial contrasted a "real, substantial doubt" to a doubt "that [was] merely possible or imaginary." Trial ROA Dkt. No. 857. Given the similarity between this language and the language upheld in *Victor*, the Utah Supreme Court could reasonably consider Mr. Menzies's jury instruction as permissible under *Victor*.

We addressed a virtually identical challenge in *Tillman v. Cook*, 215 F.3d 1116 (10th Cir. 2000). There the trial court issued the same instruction, prompting the defendant to argue that the court had unconstitutionally equated reasonable doubt with a real, substantial doubt.

54

*Id.* at 1123–24. Like Mr. Menzies, the defendant in *Tillman* relied on *Cage*

and *Monk*. *Id.* at 1121. We rejected the defendant's argument,

distinguishing *Cage* and *Monk* in light of the instruction's contrast with

doubt that's merely possible or imaginary:

> Like the instruction in *Victor*, but unlike the *Cage* and
> *Monk* instructions, Mr. Tillman's instruction distinguishes "a
> real, substantial doubt" from "one that is merely possible or
> imaginary." In *Cage*, the Court was "concerned that the jury
> would interpret the term 'substantial doubt' in parallel with the
> preceding reference to 'grave uncertainty,' leading to an
> overstatement of the doubt necessary to acquit." Not only is the
> reference to "grave uncertainty" absent from Mr. Tillman's
> instruction, but the juxtaposition with "merely possible or
> imaginary" "makes clear that 'substantial' is used in the sense
> of existence rather than magnitude of the doubt, so the same
> concern is not present." Thus, although far from exemplary, the
> use of the substantial doubt language was not error.

*Id.* at 1125–26 (citations omitted); *accord Johnson v. Alabama*, 256 F.3d

1156, 1193–94 (11th Cir. 2001) (holding that a jury instruction did not

unconstitutionally diminish the standard of reasonable doubt because it

contrasted an "actual and substantial" doubt with a doubt that was merely

"imaginative or speculative"). We can't question the reasonableness of the

Utah Supreme Court's result given our own opinion that the same language

on "substantial doubt" hadn't constituted an error. *See Mollett v. Mullin*,

348 F.3d 902, 913 (10th Cir. 2003) (stating that our prior opinion is

relevant because it could serve as a guide in determining the

reasonableness of a state supreme court's application of Supreme Court

case law); *accord* 2 Randy Hertz & James S. Liebman, *Federal Habeas*

55

*Corpus Practice & Procedures* § 32.3 (7th ed. 2021) (stating that "circuit precedents . . . can shed light on the 'reasonableness' of the state court's application of existing Supreme Court precedents").

### 6.1.2 Willingness to Act

The Utah Supreme Court also acted reasonably in upholding the jury instruction despite the language on a willingness to act. We must assess the reasonableness of the state supreme court's result based on the arguments presented in state court. *Wellmon v. Colo. Dep't of Corrs*, 952 F.3d 1242, 1249 (10th Cir. 2020).

In his direct appeal to the Utah Supreme Court, Mr. Menzies challenged the willingness-to-act language by relying on a concurrence by one of the state supreme court justices. *See* Appellant's Opening Br. at 85, *State v. Menzies*, No. 880161 (Utah Sept. 14, 1992) (citing *State v. Johnson*, 774 P.2d 1141, 1148 (Stewart, J., concurring)). Mr. Menzies offered no authority from the United States Supreme Court supporting his challenge to the willingness-to-act language. Without meaningful input from Mr. Menzies, the state supreme court reasonably applied United States Supreme Court precedent to reject Mr. Menzies's claim.

We too have addressed the same language in the same jury instruction. *Tillman v. Cook*, 215 F.3d 1116, 1126–27 (10th Cir. 2000). There we concluded that the jury instruction had "correctly conveyed the concept of reasonable doubt to the jury." *Id.* at 1127. In light of our own

decision upholding the same language in the same jury instruction, we regard the state supreme court's decision as reasonable. *See* pp. 55–56, above.

Granted, the United States Supreme Court has criticized the language on a willingness to act. In *Holland v. United States*, the Supreme Court concluded that the trial court should have explained reasonable doubt "in terms of the kind of doubt that would make a person hesitate to act, rather than the kind on which he would be willing to act." 348 U.S. 121, 140 (1954) (citation omitted). But the Court held that when the jury instructions were read as a whole, they couldn't have misled the jury. *Id.* So *Holland* does not undermine the reasonableness of the Utah Supreme Court's consideration of the jury instruction on a willingness to act. *See Waine v. Sacchet*, 356 F.3d 510, 516 (4th Cir. 2004) ("*Holland* did not fault the instruction given to the extent of finding error, let alone find a violation of the Due Process Clause."); *Ramirez v. Hatcher*, 136 F.3d 1209, 1214 (9th Cir. 1998) ("[N]either the Supreme Court nor any circuit has invalidated an instruction which includes the willingness to act terminology where 'the charge, taken as a whole, fairly and accurately conveys the meaning of reasonable doubt.'" (quoting *United States v. Robinson*, 546 F.2d 309, 314 (9th Cir. 1976))). The Utah Supreme Court's rejection of Mr. Menzies's challenge to the jury instruction on reasonable

doubt was thus not contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

**6.2        Absence of a Constitutional Violation**

Even if Mr. Menzies could show that the Utah Supreme Court's decision was contrary to or an unreasonable application of United States Supreme Court precedent, *see* 28 U.S.C. § 2254(d)(1), he still could not obtain habeas relief. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007) (stating that § 2254(d)(1) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it."). "[E]ven when petitioners satisfy the threshold in § 2254(d), they must establish a violation of federal law or the federal constitution." *Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015).

Our court has rejected virtually identical challenges to the same instruction. *Tillman v. Cook*, 215 F.3d 1116, 1123–27 (10th Cir. 2000). Addressing the phrase "substantial doubt," we stated that "[l]ike the instruction in *Victor*, but unlike the *Cage* and *Monk* instructions, [the petitioner's] instruction distinguishes a 'real substantial doubt' from 'one that is merely possible or imaginary.'" *Id.* at 1125. We recognized use of the problematic phrase "willing to act," but we reasoned that "the cases have not held 'willing to act language' to be reversible error in itself." *Id.* at 1127. So we held that "taken as a whole, the instruction correctly conveyed the concept of reasonable doubt to the jury." *Id.*

58

Given our precedent, we would need to reject Mr. Menzies's challenge on the merits even if the state appellate court had unreasonably applied Supreme Court precedent.

**7.    The Utah Supreme Court reasonably rejected Mr. Menzies's claim of ineffective assistance of counsel during sentencing.**

Mr. Menzies also complains of his attorneys' handling of the sentencing phase.

The Utah Supreme Court concluded that Mr. Menzies had not justified habeas relief, *Menzies v. State*, 344 P.3d 581, 622–31 (Utah 2014), and this conclusion reflected a reasonable application of Supreme Court precedent and the record.

**7.1        The Evidence Presented in State Court**

In the sentencing phase, the prosecution presented evidence of Mr. Menzies's criminal record, including convictions for three robberies and an escape. In presenting this evidence, the prosecution argued that Mr. Menzies posed a continuing threat of violence and couldn't be rehabilitated. Mr. Menzies countered with testimony from a clinical psychologist, an educational psychologist, and a social worker.

The clinical psychologist testified that Mr. Menzies's boyhood had entailed extensive abuse and neglect. In the clinical psychologist's view, Mr. Menzies suffered from personality disorders but could still change his behavior. The educational psychologist concluded that Mr. Menzies

59

suffered from mental deficits but might be able to function normally with proper treatment. The social worker testified that during a period of imprisonment before the murder, Mr. Menzies had taken pride in a prison job and had not tried to escape.

Despite the presentation of this evidence, Mr. Menzies complains of his counsel's performance in the sentencing phase. Because Mr. Menzies faced the possibility of the death penalty, the sentencing court considered the evidence on his background and character. *See California v. Brown*, 479 U.S. 538, 541 (1987) ("[T]he capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his 'character or record and any of the circumstances of the offense.'" (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982))).

## 7.2       Mr. Menzies's Theories of Ineffectiveness

Mr. Menzies maintains that his counsel was deficient in

- waiting until the end of the guilt phase to start investigating mitigation,

- failing to conduct a reasonable investigation of mitigating evidence, and

- forgoing evidence of organic brain damage.

## 7.3       The Attorney's Duty to Investigate

Attorneys act deficiently when they fail to conduct a "thorough investigation—in particular, of mental health evidence—in preparation for

60

the sentencing phase of a capital trial." *Hooks v. Workman*, 689 F.3d 1148, 1201 (10th Cir. 2012) (quoting *Wilson v. Sirmons*, 536 F.3d 1064, 1083 (10th Cir. 2008), *reinstated sub nom. Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009) (en banc)). The representation becomes prejudicial if additional mitigation evidence would have created a reasonable probability of a sentence other than the death penalty. *Id.*

### 7.4　　　　　Bar to Considering Evidence Presented in Federal Court

Mr. Menzies asks us to consider evidence that he did not present in Utah state court. This evidence reveals "a multi-generational history of mental illness, substance abuse, and violent physical abuse." Appellant's Opening Br. at 50–51. That history includes

- his father's and stepfather's abuse of his mother and sister and

- his family's extreme neglect of his needs.

The federal district court declined to consider this new evidence, limiting review to the record presented in state court. R. vol. I, at 1276–77; *see Cullen v. Pinholster*, 563 U.S. 170, 186 (2011). In the district court's view, a procedural bar prevented consideration of evidence if it hadn't been presented in state court. *See* R. vol. I, at 1276–77.

Mr. Menzies had urged cause for the procedural default from the ineffectiveness of his post-conviction attorneys. The federal district court rejected this argument, reasoning that "attorney error committed during the

course of state postconviction proceedings cannot supply cause to excuse a procedural default that occur[red] in those proceedings." R. vol. I, at 1300.

In our appeal, Mr. Menzies challenges the district court's application of a procedural bar. For this challenge, he relies on the Supreme Court's opinions in *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013). Applying *Martinez* and *Trevino*, Mr. Menzies asserts that he established cause to overcome a procedural default because

- he had needed to raise his claim of ineffective assistance of counsel through a collateral proceeding rather than the direct appeal and

- he had obtained ineffective assistance of counsel in the collateral proceeding.

We review de novo Mr. Menzies's legal argument challenging the application of a procedural bar. *Banks v. Workman*, 692 F.3d 1133, 1147–48 (10th Cir. 2012) (Gorsuch, J.).

We have elsewhere assumed that Mr. Menzies has established the first requirement to overcome the procedural bar (that Utah law required him to make this claim of ineffective assistance in a collateral proceeding rather than in the direct appeal). *See* p. 46, above.[15] But Mr. Menzies has

---

[15]    When Mr. Menzies filed his direct appeal, Utah hadn't yet changed its rule to allow consideration of ineffective-assistance claims in the direct appeal. *See* Utah. R. App P. 23B (eff. Oct. 1, 1992). And Mr. Menzies had the same counsel at trial and on direct appeal. So he arguably needed to claim ineffective assistance in a collateral proceeding rather than in the direct appeal.

not satisfied the second requirement, proof of ineffective assistance of counsel in the state post-conviction proceeding.

Mr. Menzies argues that his counsel in the collateral proceeding had a conflict of interest. In order to establish a conflict of interest, Mr. Menzies needed to show "a division of loyalties that [had] affected counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).

Mr. Menzies has not shown a prejudicial division of loyalties. He bases his conflict of interest on the allegation that his post-conviction attorneys had charged too much money. Appellant's Opening Br. at 49. But Mr. Menzies has not explained how the excessive attorney fees would have affected the attorneys' performance or compromised their loyalty.

Mr. Menzies also contends that his post-conviction attorneys failed to conduct a reasonable investigation on mitigation. But Mr. Menzies lacks support for this contention. His post-conviction attorneys presented the state courts with three new items:

1. an expert opinion from a psychologist, which had attributed Mr. Menzies's personality disorders to a "brutal childhood," *see* Post-Conviction R. at 13,618, 13,610–20,

2. an expert opinion from a neuropsychologist, who had diagnosed Mr. Menzies with "neurological/psychiatric conditions" that had likely impaired his capacity to form intent at the time of the murder, *see id.* at 12,473–81, and

3. an affidavit from a capital mitigation specialist, who had opined on many new details involving abuse and neglect, *see id.* at 10,716–20, 15,452.

63

Given the mitigation evidence gathered and submitted in the state post-conviction proceedings, we conclude that Mr. Menzies's post-conviction attorneys were not deficient. Because Mr. Menzies hasn't shown cause to overcome the procedural bar, we limit our review to the evidence presented in state court. *See* pp. 61–62, above.

**7.5        Delayed Investigation of the Mitigating Evidence**

Mr. Menzies complains that his trial counsel shouldn't have waited until after the guilt phase to start investigating mitigation evidence. Despite this complaint, Mr. Menzies acknowledges that he had met with one of the trial experts (a psychologist) roughly fourteen months before the trial. But, Mr. Menzies adds, both his trial counsel and the psychologist waited until one or two days before the sentencing to meet with a sister and an aunt, the only relatives to testify for Mr. Menzies.

The Utah Supreme Court rejected Mr. Menzies's challenge, reasoning that "[e]ven if it is true that counsel did not begin the mitigation investigation until after the guilt phase, . . . Mr. Menzies failed to demonstrate how this [would have] prejudiced his case." *Menzies v. State*, 344 P.3d 581, 625 (Utah 2014). Mr. Menzies attacks this reasoning, contending that trial counsel should have interviewed other family members, particularly Mr. Menzies's father and stepparents. According to Mr. Menzies, those family members could have provided insights far beyond the sister's testimony about the father's abuses.

64

In our view, the Utah Supreme Court reasonably rejected Mr. Menzies's complaint that his attorneys had taken too long to start investigating mitigation evidence. Mr. Menzies had complained that his counsel had waited to interview the aunt and sister until right before the start of the sentencing stage. Regardless of the timing, however, the aunt and sister ultimately testified about "numerous 'gruesome' details concerning Mr. Menzies's abuse and neglect." *Menzies v. State*, 344 P.3d at 627. For example, the sister described physical abuse by two stepfathers. Original Trial Tr. at 2910–12, 2915–16. And Mr. Menzies's aunt described neglect by Mr. Menzies's mother. *Id.* at 2950–51.

Mr. Menzies presents no evidence suggesting that an earlier investigation would have provided qualitatively different or additional evidence of mitigation. A fair-minded jurist could thus conclude that the Utah Supreme Court had acted reasonably in finding a failure to show prejudice.

## 7.6        Failure to Investigate Other Mitigating Evidence

Mr. Menzies claims that his attorney should have investigated potential sexual abuse by his father and stepparents. The Utah Supreme Court rejected these claims.

For the allegation of sexual abuse, the attorney presented no corroboration by Mr. Menzies's sister, his aunt, or his three mental-health experts. But in state post-conviction proceedings, Mr. Menzies presented

65

an affidavit from a mitigation specialist, stating that "there was some information provided that indicated [Mr. Menzies] *may* have been molested by his stepmother." *Menzies v. State*, 344 P.3d 581, 626 (Utah 2014) (alteration in original) (emphasis added). The mitigation specialist did not explain the possibility of molestation or identify any supporting evidence.

Mr. Menzies also complains that his attorney didn't try to find the father or stepfathers. The Utah Supreme Court noted that (1) the father had not been seen in twelve years, (2) Mr. Menzies had supplied no information suggesting that the stepfathers could have been available to testify, (3) the aunt and sister had testified for Mr. Menzies, and (4) there was no sign that the father or stepfathers could have provided additional relevant information. *Id.* at 628.

Mr. Menzies presents no basis to question the reasonableness of the Utah Supreme Court's decision. He says that sexual abuse is often surrounded by secrecy and manipulation, but he does not say what the attorney failed to explore. And even if the attorney should have investigated further, Mr. Menzies does not show how more information about sexual abuse would have made a difference at the sentencing phase. Even now, Mr. Menzies presents no evidence of actual sexual abuse.

For similar reasons, Mr. Menzies hasn't shown that his counsel failed to learn about the other relatives that would have affected the sentencing. The Utah Supreme Court reasonably concluded that Mr. Menzies was just

66

speculating about the possibility of additional mitigating evidence from family members. This conclusion was at least reasonable based on the state-court record.

Mr. Menzies also complains of a failure to investigate his family history. The Utah Supreme Court rejected this claim, reasoning that the defense attorney had presented testimony from experts and family members about Mr. Menzies's social history, his history of abuse, his mental health, his educational background, his incarcerations, his employment, and his potential for rehabilitation. *Menzies v. State*, 344 P.3d 581, 628 (Utah 2014). Reasonable jurists might have reached a different conclusion, but Mr. Menzies does not show how we could regard the Utah Supreme Court's conclusions as unreasonable.

## 7.7    Failure to Present Evidence of Organic Brain Damage

Mr. Menzies also claims that his trial counsel should have presented evidence of organic brain damage. For this claim, Mr. Menzies flags a notation made during his confinement as a juvenile. This notation says that Mr. Menzies "functions below his ability level and was found to have minimal brain damage." Appellant's Opening Br. at 63 (citing Penalty Phase, State Ex. 8, at 91).

In Mr. Menzies's view, this notation should have alerted trial counsel to the possibility of organic brain damage. In support, Mr. Menzies points

67

to a neuropsychological evaluation submitted in the state post-conviction proceedings.

The Utah Supreme Court rejected Mr. Menzies's claim, reasoning that

- the experts testifying at the sentencing had "found no supporting evidence in their inquiries" and

- such evidence could have undermined Mr. Menzies's theory of his potential for rehabilitation.

*Menzies v. State*, 344 P.3d 581, 629 (Utah 2014).

Mr. Menzies hasn't shown that the Utah Supreme Court acted unreasonably in concluding that he had failed to show a deficiency in the representation. Though Mr. Menzies points to the possibility of an organic brain injury, he hasn't pointed to any evidence of an organic injury that trial counsel failed to present.

The neuropsychological evaluation submitted in the post-conviction proceedings refers only to a notation of "organic brain syndrome" and "minimal brain dysfunction syndrome" as a juvenile. *See* Post-Conviction R. at 11,502. But this evidence was presented at sentencing: A clinical psychologist testified about the notation, and the trial court acknowledged the notation when imposing the sentence. Given the discussion of the notation by the clinical psychologist and the trial court, the

neuropsychological evaluation doesn't show a deficiency from the attorney's failure to present other evidence of organic brain injury.

Nor has Mr. Menzies shown a flaw in the Utah Supreme Court's analysis of prejudice. Mr. Menzies complains that his trial attorney should have investigated further. But Mr. Menzies doesn't suggest that he's ever had a diagnosis of organic brain injury.

Without such a diagnosis, Mr. Menzies's trial counsel reasonably argued that Mr. Menzies could change his behavior. That argument would have been difficult to maintain if the sentencing judge had attributed Mr. Menzies's violence to an organic brain injury. *See Gilson v. Sirmons*, 520 F.3d 1196, 1248 (10th Cir. 2008) (observing that evidence of organic brain damage may undermine mitigation arguments by suggesting that the defendant is dangerous and will remain a threat to others); *see also Grant v. Royal*, 886 F.3d 874, 924–25 (10th Cir. 2018) (rejecting an ineffective-assistance claim in part because additional evidence of organic brain damage "could have been in tension with the mitigation case and had a double-edged effect"). After all, Mr. Menzies hasn't suggested the possibility of treating his alleged organic brain damage with medication. *See Grant*, 886 F.3d at 923 (concluding that the state appeals court could reasonably consider the mitigation value of organic brain damage as "significantly weakened" by the lack of any evidence that the negative

manifestations would have been "treatable with medication or other such means").

* * *

We conclude that the Utah Supreme Court acted reasonably in rejecting Mr. Menzies's claims of ineffective assistance in the sentencing phase.

## 8.     The Utah Supreme Court acted reasonably in rejecting Mr. Menzies's challenges to the admissibility of documents from his prison file.

Mr. Menzies also challenges the introduction of his prison file during the sentencing phrase. The Utah Supreme Court acted reasonably in rejecting these challenges.

## 8.1     The Utah Supreme Court reasonably concluded that introduction of mental-health evaluations had not violated the Fifth Amendment.

Mr. Menzies challenges the introduction of evaluations from March 1973, December 1975, September 1976, July 1979, and September 1980.[16] In these evaluations, mental-health professionals had

- summarized Mr. Menzies's family history and record of criminal conduct and

---

[16]     Mr. Menzies also refers to psychiatric reports in

- February 1973,

- February 1976, and

- March 1976.

70

- presented diagnoses, prognoses, and recommendations for treatment.

Mr. Menzies complains that the State used these records even though the mental-health professionals hadn't provided *Miranda* warnings.[17]

In the trial court, Mr. Menzies did not present a *Miranda* challenge. So the Utah Supreme Court would ordinarily confine its review to the plain-error standard. *See State v. Holgate*, 10 P.3d 346, 350 (Utah 2000). But here, the court rejected Mr. Menzies's challenge to the admission of the prison file without discussing the issue. *See State v. Menzies*, 889 P.2d 393, 406 (Utah 1994) (concluding that "[w]e find Menzies's other claims

_____

But the habeas petition doesn't mention these reports.

[17]     The State argues that Mr. Menzies (1) framed the issue beyond the certificate of appealability and (2) failed to identify specific statements that should have been excluded.

We disagree with the State's characterization of Mr. Menzies's claim. He challenged the introduction of the entire prison file, but he also identified specific evaluations that should have been excluded. *See* R. vol. II, at 179–80 (Second Amended Petition for a Writ of Habeas Corpus, Claim 18). On appeal, Mr. Menzies challenges the introduction of evaluations within a claim encompassed in the district court's certificate of appealability. *See* Appellant's Opening Br. at 67.

Mr. Menzies does not identify specific statements; he instead challenges the use of all the evaluations based on a failure to give him *Miranda* warnings. Mr. Menzies made that challenge in his habeas petition, and the district court's certificate of appealability encompasses this challenge.

to be without merit"). So we can't tell whether the Utah Supreme Court reviewed the issue under the plain-error standard.

Without an explanation from the Utah Supreme Court, we give Mr. Menzies the benefit of the doubt, assuming for the sake of argument that the Utah Supreme Court treated the claim as preserved. With this assumption, we determine the reasonableness of the Utah Supreme Court's decision. *See Douglass v. Workman*, 560 F.3d 1156, 1168 (10th Cir. 2009) (per curiam) ("In situations like this one [when the court cannot determine whether a state court ruling was on the merits], our cases require us to assume that the state's review is on the merits and thus afford it § 2254(d) deference.").

For his challenge, Mr. Menzies relies on *Estelle v. Smith*, 451 U.S. 454 (1981). In *Estelle*, the trial court ordered a psychiatric examination to evaluate competency. *Id.* at 456–57. This psychiatrist not only evaluated the defendant's competency but also testified for the State in the sentencing phase, opining that the defendant was "a very severe sociopath" who lacked remorse and would continue his violent behavior. *Id.* at 459–60. In forming these opinions, the psychiatrist relied on the defendant's statements during the competency evaluation. *Id.* at 464–65.

The United States Supreme Court held that the introduction of the psychiatrist's testimony had violated the Fifth Amendment. *Id.* at 468. For this holding, the Court reasoned that the defendant had obtained "no

72

indication" that the State would use the compulsory examination to gather evidence bearing on the possibility of a death sentence. *Id.* at 467. Without *Miranda* warnings, the United States Supreme Court concluded that the trial court should have excluded the defendant's statements to the psychiatrist. *Id.* at 469.

Applying *Estelle*, the Utah Supreme Court acted reasonably in rejecting this claim because

- *Estelle* could be distinguished,

- the Supreme Court's precedents would not require consideration of the evaluations as custodial interrogations, and

- the Supreme Court's holdings would not require application of the exclusionary rule in the sentencing phase.

The Utah Supreme Court could reasonably distinguish *Estelle* based on *Penry v. Johnson*, 532 U.S. 782 (2001). The *Penry* Court observed that

- *Estelle* had limited its holding to "the 'distinct circumstances' presented there" and

- the Supreme Court had "never extended *Estelle*'s Fifth Amendment holding beyond its particular facts."

*Id.* at 795 (quoting *Estelle*, 451 U.S. at 466). In *Penry*, the petitioner challenged the admission at sentencing of a psychiatrist's opinions from an earlier proceeding. *Id.* at 793. For this challenge, the petitioner in *Penry* cited *Estelle*, arguing that it required exclusion of the psychiatrist's

73

opinions in the absence of *Miranda* warnings. *Id.* at 793–94. The Supreme Court disagreed, distinguishing *Estelle*. *Id.* at 794.

The *Penry* Court interpreted *Estelle* to consider use of statements when the court required a psychiatric examination involving pending charges of a capital crime. *Id.* When the psychiatrist elicited the incriminating information in *Estelle*, "it was [] clear that his future dangerousness would be a specific issue at sentencing." *Id.* In *Penry*, however, the psychiatric examination had preceded the murder. *Id.*

This distinction could reasonably apply here too because Mr. Menzies's evaluations had preceded the murder charge. So the mental-health professionals conducting the evaluations did not elicit statements for the prosecution to use.

The Utah Supreme Court could reasonably rely not only on this difference with *Estelle* but also on doubt as to the existence of a custodial interrogation. *Miranda* warnings are required only for custodial interrogations. *See Howes v. Fields*, 565 U.S. 499, 508–09 (2012). Mr. Menzies alleges a custodial interrogation because he was evaluated while confined on criminal charges. But the United States Supreme Court has considered "custody" a term of art referring to circumstances that are thought generally to present "a serious danger of coercion." *Id.* "[S]ervice of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Id.* at 512.

74

The Utah Supreme Court could thus reasonably conclude that Mr. Menzies had failed to identify circumstances creating a danger of coercion. For example, the court could base this conclusion on the Fifth Circuit's opinion in *Cobble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007). There the court concluded that *Miranda* does not apply to mental-health evaluations, reasoning that

- a psychiatric consultation did not constitute a custodial interrogation because "[the petitioner's] statements were simply for the purpose of medical and psychiatric diagnosis" and

- "[u]nlike the defendant in *Estelle v. Smith*, [the petitioner] was not 'faced with a phase of the adversary system,' but was 'in the presence of [a] perso[n] acting solely in his interest.'"

*Id.* at 440 (fourth and fifth alterations in original) (quoting *Estelle v. Smith*, 451 U.S. 454, 467–69 (1981)).

Even if the interview had been custodial, the state appellate court could have reasonably declined to apply the exclusionary rule. The United States Supreme Court has not addressed the applicability of the exclusionary rule in the sentencing phase, but we've held that the rule doesn't apply there. *See United States v. Hinson*, 585 F.3d 1328, 1335 n.3 (10th Cir. 2007) ("The exclusionary rule does not bar the admission of the fruits of an illegal search at sentencing unless the illegal search was conducted with the intent to obtain evidence that would increase the defendant's sentence."); *United States v. Salazar*, 38 F. App'x 490, 495–96

75

(10th Cir. 2002) (unpublished) (concluding that "even if we assume that [the defendant's] statements to [law enforcement agents] were obtained in violation of his Fifth Amendment rights, the district court did not err in considering them at sentencing"); *accord United States v. Nichols*, 438 F.3d 437, 442 (4th Cir. 2006) ("[S]tatements obtained in violation of *Miranda*, if they are otherwise voluntary, may generally be considered at sentencing."). Because we've held that federal law doesn't require application of the exclusionary rule in the sentencing phase, we can't question the reasonableness of the Utah Supreme Court's disposition of the *Miranda* claim. *See Mollett v. Mullin*, 348 F.3d 902, 913 (10th Cir. 2003) (stating that our prior opinion is relevant because it could serve as a guide in determining the reasonableness of a state court's application of Supreme Court case law); *see also* 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice & Procedures* § 32.3 (7th ed. 2021) (stating that "circuit precedents . . . can shed light on the 'reasonableness of the state court's application of existing Supreme Court precedents'").

In conclusion, Mr. Menzies has not shown a failure to reasonably apply *Miranda*. Though Mr. Menzies relies on *Estelle*, *Penry*'s distinctions with *Estelle* could apply here too. And the Supreme Court's holdings wouldn't require (1) consideration of the mental-health evaluations as custodial or (2) application of the exclusionary rule in the sentencing phase.

76

**8.2     Introduction of Mr. Menzies's prison file did not deny the right to confrontation, constitute a denial of due process, or entail cruel and unusual punishment.**

Mr. Menzies also claims that the trial court committed constitutional violations in allowing the introduction of his prison file, which contained social histories, incident reports, and information about disciplinary hearings.

**8.2.1     Confrontation Clause**

Mr. Menzies relies in part on the Sixth Amendment's Confrontation Clause. In state court, however, Mr. Menzies conceded that the United States Supreme Court had "not directly held that the right to confrontation applies to the penalty phase of a capital trial." Appellant's Opening Br. at 126, *State v Menzies*, No. 880161 (Utah Sept. 14, 1992). Without controlling precedent from the United States Supreme Court, our court and other circuit courts have declined to apply the Confrontation Clause in the sentencing phase. *See Carter v. Bigelow*, 787 F.3d 1269, 1294 (10th Cir. 2015) (rejecting a habeas challenge to the admission of out-of-court statements, reasoning that "[t]he Supreme Court has never held that the Confrontation Clause applies at a capital sentencing"); *United States v. Fields*, 483 F.3d 313, 335 (5th Cir. 2007) ("Neither the text of the Sixth Amendment nor the history of murder trials supports the extension of the Confrontation Clause to testimony relevant only to penalty selection in a capital case."); *United States v. Harmon*, 721 F.3d 877, 888 (7th Cir. 2013)

77

("The Confrontation Clause does not apply at sentencing."); *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000) ("In making factual determinations, a sentencing judge is generally not restricted to evidence that would be admissible at trial."); *Chandler v. Moore*, 240 F.3d 907, 918 (11th Cir. 2001) ("[H]earsay evidence is admissible at a capital sentencing."); *see also* John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 Colum. L. Rev. 1967, 1980 (2005) ("The [United States Supreme] Court has never said that the right to 'deny or explain' sentencing information includes . . . the right to see, hear, and cross-examine the sources of that information." (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977) (plurality opinion))). Given these opinions by our court and other circuit courts, we do not question the reasonableness of the Utah Supreme Court's application of clearly established federal law to reject Mr. Menzies's Sixth Amendment claim. *See Mollett v. Mullin*, 348 F.3d 902, 913 (10th Cir. 2003) (stating that our prior opinion is relevant because it could serve as a guide in determining the reasonableness of a state court's application of Supreme Court case law); *see also* 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice & Procedures* § 32.3 (7th ed. 2021) (stating that "circuit precedents . . . can shed light on the reasonableness of the state court's application of existing Supreme Court precedents").

78

### 8.2.2 Due Process

Mr. Menzies also claims a denial of due process because the prison records lacked sufficient indicia of reliability. For this claim, Mr. Menzies relies on *Gardner v. Florida*, 430 U.S. 349 (1977), and *Townsend v. Burke*, 334 U.S. 736 (1948). But these cases differed from ours.

For example, *Gardner* addressed reliance on a part of the presentence report that had been withheld from the defendant and his attorney. 430 U.S. at 353–54 (plurality opinion). Though the State had withheld part of the report, the trial judge imposed a death sentence partly in reliance on the contents. *Id.* at 353. The United States Supreme Court found a denial of due process because the trial court had imposed a death sentence based partly on information withheld from the defendant. *Id.* at 362.

*Townsend* addressed reliance on mistaken assumptions. 334 U.S. 736, 741. There the defendant had been sentenced based on untrue assumptions about his criminal record. *Id.* Because the trial judge had not allowed the defendant to challenge the erroneous information, the United States Supreme Court found a denial of due process. *Id.*

Unlike the defendants in *Gardner* and *Townsend*, Mr. Menzies had a chance to review the documents used in the sentencing phase. And he points to nothing false or misleading. Given Mr. Menzies's opportunity to review the documents and his failure to identify anything false or misleading, the Utah Supreme Court could reasonably conclude that

introduction of the documents hadn't denied due process to Mr. Menzies.

*See United States v. Lewis*, 910 F.2d 1367, 1373 (7th Cir. 1990)

(concluding that prison records were admissible at sentencing because the

sentencing court could "consider a wide variety of information, including

hearsay").[18]

### 8.2.3    Cruel and Unusual Punishment

Finally, Mr. Menzies characterizes the introduction of these

documents as cruel and unusual punishment. But he cites no Supreme Court

authority for this claim. Given the lack of supporting precedent from the

United States Supreme Court, the Utah Supreme Court could reasonably

conclude that introduction of the documents hadn't violated Mr. Menzies's

protection from cruel and unusual punishment.

---

[18]    Mr. Menzies also cites the dissent from the state supreme court's opinion in his direct appeal. There the dissenting justice concluded that the trial judge should have evaluated the relevance and reliability of the documents before allowing them into evidence. For this conclusion, the justice relied on Utah Supreme Court opinions concluding that evidence offered in capital sentencing proceedings must bear relevance and reliability. *State v. Menzies*, 889 P.2d 393, 408 (Utah 1994) (Stewart. J., dissenting). But clearly established federal law consists of decisions by the United States Supreme Court, not the Utah Supreme Court. *See Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013) (stating that clearly established federal law hinges on the United States Supreme Court's holdings). So the Utah Supreme Court's dissent doesn't suggest a failure to reasonably apply clearly established federal law.

**9.      The Utah Supreme Court reasonably concluded that the trial court had not violated the Constitution by relying on uncharged aggravating circumstances.**

Mr. Menzies claims violation of the Eighth and Fourteenth Amendments because the trial court relied on three uncharged aggravating circumstances:[19]

1.      The murder was committed "in an especially heinous, atrocious, cruel manner demonstrated by serious bodily injury to the victim before death." Utah Stat. Ann. § 76-5-202(1)(q) (1988).

2.      The murder "was committed" for "pecuniary or other personal gain." Utah Stat. Ann. § 76-5-202(1)(f) (1988).

3.      The murder "was committed for the purpose of preventing a witness from testifying." Utah Stat. Ann. § 76-5-202(1)(i) (1988).

Original Trial Tr. at 3249–50. Mr. Menzies claims that

- these aggravating circumstances hadn't been charged, supported, or found by the jury, and

- the Utah Supreme Court failed to discuss the prejudice from the trial court's erroneous consideration of the aggravating circumstances involving pecuniary gain and prevention of testimony.

In our view, the Utah Supreme Court acted reasonably in determining the facts and in applying clearly established federal law. Though the court

---

[19]     Mr. Menzies also says that it was "problematic" for the trial judge to rely on an aggravating circumstance involving a prior felony conviction for threats or violence. But he acknowledges that such evidence existed here and was "typical" of evidence presented in capital sentencing proceedings. He thus doesn't appear to challenge use of this aggravating circumstance.

omitted any discussion about two of the aggravating circumstances, the omission didn't violate Mr. Menzies's constitutional rights.

**9.1      Utah law allowed the prosecution to allege additional aggravating circumstances at sentencing.**

We must consider Utah's uses of aggravating circumstances. Under applicable Utah law, the death penalty could be imposed only after a conviction of a homicide requiring proof of at least one aggravating circumstance identified in a statutory list. *See State v. Tillman*, 750 P.2d 546, 569–70 & n.90 (Utah 1987) (discussing Utah Code Ann. § 76-5-202(1), the Utah capital murder statute in effect at the time of the murder and the trial). "Utah's statutory scheme incorporate[d] the aggravating circumstances into the definition of the first degree murder offense, thereby initially narrowing the pool of defendants eligible for the death penalty in the guilt phase, rather than in the penalty phase, of the trial." *Id.* at 570. After conviction of a murder involving an aggravating circumstance, the trial court needed to conduct a sentencing hearing "to take evidence of additional aggravating factors and any mitigating factors the defendant may be able to prove." *State v. Wood*, 648 P.2d 71, 79 (Utah 1982); *see* Utah Stat. Ann. § 76-3-207(1) (1982).

At the sentencing hearing, the court could consider various evidentiary items:

> [E]vidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and

circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence. The state's attorney and the defendant shall be permitted to present argument for or against sentence of death. *Aggravating circumstances shall include those as outlined in 76-5-202.*

Utah Stat. Ann. § 76-3-207(1) (1982) (emphasis added). The "aggravating circumstances . . . as outlined in 76-5-202" included

- the commission of murder "in an especially heinous, atrocious, cruel manner," Utah Stat. Ann. § 76-5-202(1)(q) (1988),

- the commission of murder to prevent a witness from testifying, Utah Stat. Ann. § 76-5-202(1)(i) (1988), and

- the commission of murder for personal gain, Utah Stat. Ann. § 76-5-202(1)(f) (1988).

The trial court followed the statutory procedure. In the guilt stage, the jury found not only the commission of murder but also the presence of an aggravating circumstance: commission of murder while "engaged in the commission of, attempt to commit, or flight after committing or attempting to commit robbery and aggravated kidnapping." *See* Original Trial Tr. at 2693 (jury verdict); *see also* Utah Stat. Ann. § 76-5-202(1)(d) (1988) (setting forth this aggravating circumstance). Then, after Mr. Menzies waived his right to a jury trial, the trial court conducted a sentencing hearing and obtained additional evidence bearing on the sentence.

In the sentencing phase, the prosecution urged consideration of other aggravating circumstances bearing on selection of the sentence:

- "the method and manner of death" (strangling and cutting Mrs. Hunsaker's throat with a sharp object),

- the commission of murder while perpetrating underlying felonies (robbery and aggravated kidnapping),

- the commission of murder to keep Mrs. Hunsaker from testifying,

- the planning of the murder, and

- the lack of remorse.

Original Trial Tr. at 2721–23.

**9.2     Mr. Menzies obtained adequate notice of the aggravating circumstances bearing on the sentence.**

In the direct appeal, Mr. Menzies argued that he lacked notice that the State would rely on other aggravating circumstances during the sentencing phase. Appellant's Opening Br. at 167–70, *State v. Menzies,* No. 880161 (Utah Sept. 14, 1992). The Utah Supreme Court rejected this argument. *See State v. Menzies*, 889 P.2d 393, 406 (1994) ("We find Menzies' other claims to be without merit."). "[U]nder Section 2254(d), we review the reasonableness of a state court's decision in light of the arguments the petitioner raised in the state court." *Wellmon v. Colo. Dep't of Corrs.*, 952 F.3d 1242, 1249 (10th Cir. 2020).

In light of the arguments that Mr. Menzies presented, the state appellate court acted reasonably in finding notice of additional aggravating circumstances. Mr. Menzies had cited only one opinion by the United States Supreme Court. Appellant's Opening Br. at 168–69, *State v. Menzies,* No. 880161 (Utah Sept. 14, 1992). That opinion involved a defendant who had received no notice of a possible death sentence. *See Lankford v. Idaho*, 500 U.S. 110, 127 (1991) (explaining that the "[p]etitioner's lack of adequate notice that the judge was contemplating the imposition of the death sentence created an impermissible risk that the adversary process may have malfunctioned in this case"). In Mr. Menzies's case, however, the State had charged capital homicide and made pretrial allegations of aggravating circumstances identified in the state statute. *See State v. Menzies*, 889 P.2d 393, 397 (Utah 1994).

We addressed the sufficiency of statutory notice in *Andrews v. Shulsen*, 802 F.2d 1256 (10th Cir. 1986). There we squarely held that Utah's statutory list of aggravating circumstances had provided constitutionally adequate notice. *Id.* at 1263 n.4. In *Andrews*, a Utah petitioner had been sentenced to death. *Id.* at 1259. He sought habeas relief, alleging that the State should have included the aggravating circumstances in the documents constituting the murder charges. *Id.* at 1263 n.4. We rejected this allegation: "[The habeas petitioner] could have requested a bill of particulars but failed to do so. In any event, statutory

85

notice of aggravating circumstances satisfies constitutional requirements under the Due Process Clause." *Id.* Other circuits have also rejected similar arguments involving notice of aggravating circumstances. *See Clarke v. Dugger*, 834 F.2d 1561, 1566 (11th Cir. 1987) (concluding that"[i]t is well established under Florida law that a defendant has no right to advance notice of the aggravating circumstances on which the State will rely" and the state statute's list of aggravating circumstances had satisfied the constitutional requirements); *Spinkellink v. Wainwright*, 578 F.2d 582, 609–10 (5th Cir. 1978) (concluding that a statutory list of aggravating circumstances provided adequate notice to a defendant facing a possible death sentence).

Given our own approach to notice, we can hardly view the Utah Supreme Court's identical approach as unreasonable. *See Mollett v. Mullin*, 348 F.3d 902, 913 (10th Cir. 2003) (stating that our prior opinion is relevant because it could serve as a guide in determining the reasonableness of a state supreme court's application of Supreme Court case law); *accord* 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice & Procedures* § 32.3 (7th ed. 2021) (stating that "circuit precedents . . . can shed light on the 'reasonableness' of the state court's application of existing Supreme Court precedents").

Confronting our precedent, Mr. Menzies argues that

- *Andrews* relied on an out-of-circuit opinion later overruled and

- the Utah statute's narrowing of the class of persons eligible for the death penalty did not provide adequate notice.

We reject both arguments.

First, Mr. Menzies observes that our *Andrews* opinion cited *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir. 1978). To Mr. Menzies, this observation became significant when a newly created Eleventh Circuit allegedly said that the United States Supreme Court's opinion in *Godfrey v. Georgia*, 446 U.S. 420 (1980), had overruled *Spinkellink*. But the Eleventh Circuit said only that *Godfrey* had superseded *Spinkellink*'s language "precluding federal courts from reviewing state courts' application of capital sentencing criteria." *Proffitt v. Wainwright*, 685 F.2d 1227, 1261 n.52 (11th Cir. 1982). The Eleventh Circuit did not address *Spinkellink*'s language about notice. *Spinkellink* aside, nothing suggests abrogation of *Andrews*, which is our precedent.

Mr. Menzies also argues that the state statutory scheme doesn't adequately narrow the class of persons eligible for the death penalty. This argument conflates two distinct phases of Utah's statutory system: eligibility and selection. A defendant becomes eligible for the death penalty only if the jury finds at least one aggravating circumstance. Utah Code Ann. § 76-5-202(1) (1978 & Supp. 1987). If the jury finds at least one aggravating circumstance, the trial advances to the selection phase,

87

where the sentencer can choose the death penalty only upon a finding that the total aggravation outweighs the total mitigation. *State v. Wood,* 648 P.2d 71, 83–84 (Utah 1982). The United States Supreme Court has said that the narrowing function takes place when determining eligibility, not selection. *Zant v. Stephens*, 462 U.S. 862, 878–79 (1983); *see also Buchanan v. Angelone*, 522 U.S. 269, 275–76 (1998).[20]

At the eligibility phase, the prosecution charged an aggravating circumstance: murder in the course of committing robbery and aggravated kidnapping. The State thus supplied notice of the aggravating circumstance to narrow the class of defendants eligible for the death sentence. The United States Supreme Court has never required further notice at the selection stage, so the Utah Supreme Court had no "clearly established federal law" to apply. *See Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013) (stating that clearly established federal law hinges on the United States Supreme Court's holdings). In the absence of "clearly established

---

[20]    In *Buchanan*, the court explained:

> It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.

522 U.S. at 275–76.

federal law," Mr. Menzies cannot obtain habeas relief. *See House v. Hatch*, 527 F.3d 1010, 1021 (10th Cir. 2008) ("Absent controlling Supreme Court precedent, it follows ineluctably that the New Mexico Supreme Court's decision to uphold the venue transfer cannot be either 'contrary to, or [] an unreasonable application of clearly established Federal law.'" (quoting 28 U.S.C. § 2254(d)(1))). So Mr. Menzies is not entitled to habeas relief on this claim. *See id.* at 1018 ("The absence of clearly established federal law is dispositive under § 2254(d)(1).").

**9.3        The prosecution did not need to prove each aggravating circumstance beyond a reasonable doubt.**

Mr. Menzies also asserts that the jury never found three of the aggravating circumstances: (1) a heinous, atrocious and cruel murder, (2) a murder to prevent a witness from testifying, and (3) a murder for pecuniary gain. This assertion consists of a single sentence within the discussion involving inadequate notice of aggravating circumstances. This sentence does not adequately develop a distinct appellate challenge. *See Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 n.3 (10th Cir. 2008) (stating that a single fleeting sentence in an appellate brief "is too inadequately developed to be meaningfully addressed and is deemed waived" (quoting *United States v. Martinez*, 518 F.3d 763, 768 (10th Cir. 2008))).

Even if Mr. Menzies had developed this challenge, it would appear meritless. The jury found (1) Mr. Menzies guilty of first-degree murder and (2) his commission of murder while "engaged in the commission of, attempt to commit, or flight after committing or attempting to commit robbery and aggravated kidnapping." Original Trial Tr. at 2693. At the selection phase, the sentencing judge didn't need to make findings on each aggravating circumstance. Instead, the factfinder had to

- compare the totality of aggravating factors to the totality of the mitigating factors and

- determine whether a death sentence was warranted.

*State v. Wood,* 648 P.2d 71, 83–84 (Utah 1982). The trial court made that comparison and decided on the death penalty. *See* Original Trial Tr. at 3268, 3270 (finding that "the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt" and warrant the death penalty). Mr. Menzies cites nothing to require findings on each aggravating factor at the selection stage.

**9.4       The Utah Supreme Court didn't violate any constitutional rights by omitting discussion of two aggravating circumstances from the analysis of harmless error.**

Mr. Menzies points out that when the Utah Supreme Court addressed harmless error, there was no discussion of two disputed aggravating circumstances (commission of murder for pecuniary gain and prevention of testimony). But as just discussed, the trial court didn't err by considering

90

these aggravating circumstances. So the Utah Supreme Court had no reason

to discuss harmlessness for these aggravating circumstances.

10.       **The Utah Supreme Court reasonably rejected Mr. Menzies's challenge to the constitutionality of the aggravating circumstances.**

Mr. Menzies also challenges the constitutionality of the trial court's

reliance on two aggravating circumstances:

1.    murders that are heinous, atrocious, and cruel, Utah Code Ann. § 76-5-202(1)(q) (1988) and

2.    murders committed for pecuniary gain, Utah Code Ann. § 76-5-202(1)(f) (1988).

The Utah Supreme Court concluded that

- the trial court had not plainly relied on the aggravating circumstance for murders that are heinous, atrocious, and cruel and

- any possible error would have been harmless.

*State v. Menzies*, 889 P.2d 393, 405 (Utah 1994). Without discussion, the

court rejected Mr. Menzies's challenge to the aggravating circumstance for

pecuniary gain. *Id.* at 406 ("We find Menzies's other claims to be without

merit.").

In our view, the Utah Supreme Court acted reasonably. We reject Mr.

Menzies's challenges.

**10.1      Aggravating Circumstance for Murders that are Heinous, Atrocious, and Cruel**

At the time of the trial, the Utah Supreme Court had yet to interpret Utah's aggravating circumstance for murders that are heinous, atrocious, and cruel. But after Mr. Menzies appealed in state court, the Utah Supreme Court decided *State v. Tuttle*, 780 P.2d 1203 (Utah 1989). There the court concluded that this aggravating circumstance could satisfy the Constitution only if the defendant had

- inflicted "physical torture, serious physical abuse, or serious bodily injury [upon] the victim before death" in a manner "qualitatively and quantitatively different and more culpable than that necessary to accomplish the murder" and

- inflicted the abuse while in a "mental state materially more depraved or culpable than that of most other murderers."

*Id.* at 1215–17 (citations omitted).

In Mr. Menzies's direct appeal, the Utah Supreme Court concluded that application of the aggravating circumstance hadn't constituted plain error. *State v. Menzies*, 889 P.2d 393, 405 (Utah 1994). For this conclusion, the court explained that

- it had "no solid reason to believe that the [trial] judge thought this was an appropriate situation for reliance on the heinous factor listed in § 76-5-202-1(q),"

- the trial judge might have been agreeing with the prosecutor's statement about "the brutal and heinous nature of the murder,"

- the prosecutor's statement had not referred to § 76-5-202-1(q), and

92

- any error would have been harmless.

*Id.*

### 10.1.1    Merits

The Utah Supreme Court's disposition under the plain-error test constituted a reasonable application of the evidence and clearly established federal law. At the sentencing phase, the prosecution had relied on the aggravating circumstance for "the method and the manner of death." Original Trial Tr. at 2721. For this argument, the prosecution relied on two pieces of evidence: (1) Someone had strangled Mrs. Hunsaker and cut her throat with a sharp object, and (2) the medical examiner had testified that the cutting of Mrs. Hunsaker's throat had just started her descent into death. *Id.* at 1620–21, 2721.

When announcing the reasons for the death sentence, the trial court found that "the homicide [had been] committed in an especially heinous, atrocious, cruel manner demonstrated by serious bodily injury to the victim before death." *Id.* at 3250; *see* Utah Code Ann. § 76-5-202(1)(q) (1988). But the court didn't conclude that the prosecution had satisfied *Tuttle*'s requirements for murders that are heinous, atrocious, and cruel.

Given that omission, Mr. Menzies argued that the trial court had failed to narrow the aggravating circumstances, pointing to United States Supreme Court precedent requiring a precise definition to "provide a

meaningful distinction between capital and non-capital murders." Appellant's Opening Br. at 158–63, *State v. Menzies*, No. 880161 (Utah Sept. 14, 1992) (quoting *State v. Tuttle*, 780 P.2d 1203, 1217 (Utah 1989) and discussing *Godfrey v. Georgia*, 446 U.S. 420 (1980)). But Mr. Menzies didn't acknowledge the distinction between the eligibility and selection phases. *See Buchanan v. Angelone*, 522 U.S. 269, 275–76 (1998) (discussing these two phases).

In the eligibility phase, the factfinder narrows the class of defendants eligible for the death penalty by determining whether the crime fits within a particular classification. *Tuilaepa v. California*, 512 U.S. 967, 973, 983 (1994). In the selection phase, the factfinder determines whether to impose the death penalty on an eligible defendant. *Buchanan*, 522 U.S. at 275–76. In this phase, the court ordinarily broadens the inquiry to consider "relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Tuilaepa*, 512 U.S. at 973, 983.

Although state sentencing procedures don't always fall neatly into these two categories, Mr. Menzies's trial involved discrete stages for eligibility and selection. A jury found Mr. Menzies eligible for the death penalty because he had committed a murder in the course of a robbery and an aggravated kidnaping. A separate proceeding followed, where the trial judge found additional aggravating circumstances and selected the death penalty as the appropriate sentence.

94

But Mr. Menzies identifies no United States Supreme Court opinion requiring precision in the definition of aggravating circumstances at a selection phase that follows a factfinder's determination of eligibility for the death penalty. For example, in his direct appeal, Mr. Menzies relied mainly on *Godfrey v. Georgia*, 446 U.S. 420 (1980). In *Godfrey*, the jury had been instructed on one overly broad aggravator and imposed a death sentence. *Id*. at 426. Unlike Mr. Menzies, the *Godfrey* defendant faced the disputed aggravating circumstance before he was deemed eligible for the death penalty. *Id.*

Mr. Menzies also relies on *Maynard v. Cartwright*, 486 U.S. 356 (1988). But there too, the trial court didn't provide a separate phase for the jury to decide eligibility for the death penalty. *See id.* at 358–59.

Because the Utah Supreme Court concluded that the trial judge had not relied on the aggravating circumstances for murders that are heinous, atrocious, and cruel, the court didn't address Mr. Menzies's challenges. *See State v. Menzies*, 889 P.2d 393, 405 (Utah 1994). In our view, the court's conclusion on plain error didn't implicate any precedents from the United States Supreme Court. Without such precedents, this claim fails for lack of clearly established federal law. *See House v. Hatch*, 527 F.3d 1010,

95

1018 (10th Cir. 2008) ("The absence of clearly established federal law is dispositive under § 2254(d)(1)."). [21]

### 10.1.2      Consideration of Mitigating Factors

Mr. Menzies also contends that the Utah Supreme Court improperly ignored the mitigating factors. We disagree with Mr. Menzies's interpretation of the Utah Supreme Court's opinion. The court referred to "the mitigating factors" and stated that it had reweighed the remaining aggravating factors against the mitigating factors. *Id.* (quoting *State v. Archuleta*, 850 P.2d 1232, 1248 (Utah 1993)). We thus conclude that the Utah Supreme Court did not ignore the mitigating factors.

### 10.2      Sufficiency of the Evidence on Aggravating Circumstances

In a single sentence, Mr. Menzies also asserts that the prosecution lacked sufficient evidence of these aggravating circumstances. This sentence was not enough to develop this argument, so it's waived. *See Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 n.3 (10th Cir. 2008) (stating that a single fleeting sentence in an appellate brief "is too inadequately developed to be meaningfully addressed and is

---

[21]   The Utah Supreme Court also concluded that any error in considering this aggravating circumstance would have been harmless. *State v. Menzies*, 889 P.2d 393, 405 (Utah 1994). In challenging this conclusion, Mr. Menzies argues that Utah Supreme Court applied the wrong standard in evaluating harmlessness. But Mr. Menzies has not shown a violation of clearly established federal law in the consideration of this aggravating circumstance. So we need not address Mr. Menzies's challenge to the Utah Supreme Court's decision on harmlessness.

deemed waived" (quoting *United States v. Martinez*, 518 F.3d 763, 768 (10th Cir. 2008))). Even if Mr. Menzies hadn't waived the argument, though, we'd reject it.

For the aggravating circumstance of murder for pecuniary gain, the prosecution presented evidence that (1) cash was missing from Mrs. Hunsaker's register and (2) roughly the same amount had been discovered in Mr. Menzies's apartment.

The prosecution also presented evidence that Mr. Menzies had killed Mrs. Hunsaker to prevent her from testifying. For example, Mr. Britton testified that Mr. Menzies had admitted killing Mrs. Hunsaker to prevent her from testifying. And Mr. Menzies had been convicted of other robberies based on the testimony of witnesses who had not been killed. The trial court could thus reasonably determine that Mr. Menzies had decided to kill Mrs. Hunsaker to prevent her from testifying.

So even without a waiver, we would have rejected Mr. Menzies's challenge to the sufficiency of evidence on the aggravating circumstances.

## 10.3     Reasonable jurists could reject Mr. Menzies's claim involving reliance on duplicative aggravating circumstances.

Mr. Menzies argues that the trial court violated the Eighth Amendment by relying on aggravating circumstances that

- the murder had been committed while Mr. Menzies was engaged in the commission of, an attempt to commit, or flight after committing, or attempting to commit a robbery and

- the murder had been committed for pecuniary gain.

Mr. Menzies contends that these two aggravating circumstances were duplicative because they involved the same acts. On direct appeal, the Utah Supreme Court summarily rejected this argument. *See State v. Menzies*, 889 P.2d 393, 406 (Utah 1994) ("We find Menzies' other claims to be without merit.").

We've held that the double counting of aggravating factors tends "to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *United States v. McCullah*, 76 F.3d 1097, 1111 (10th Cir. 1996). Under our case law, double counting occurs if one factor "necessarily subsumes" another. *Cooks v. Ward*, 165 F.3d 1283, 1289 (10th Cir. 1998) (quoting *United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir. 1996)).

Similarly, the Utah Supreme Court disallows counting of robbery and pecuniary gain as separate aggravating circumstances: "[R]obbery inherently comprises an attempt to gain pecuniarily. It is nonsensical to say that a defendant who commits a homicide during the commission of a robbery is somehow more deserving of the death penalty because he also committed the murder for pecuniary gain." *Parsons v. Barnes*, 871 P.2d 516, 528 (Utah 1994).

Despite these opinions from the Utah Supreme Court and our court, the United States Supreme Court has "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor ha[s] [the Court] passed on the 'double counting' theory that the Tenth Circuit advanced in *McCullah*." *Jones v. United States*, 527 U.S. 373, 398 (1999). With no Supreme Court case law condemning the double counting of aggravating circumstances, Mr. Menzies cannot obtain habeas relief on this challenge. *See House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008) ("The absence of clearly established federal law is dispositive under § 2254(d)(1).").

**11.        In rejecting Mr. Menzies's challenges involving errors in the trial transcript, the Utah Supreme Court reasonably applied Supreme Court precedent and found the pertinent facts.**

In his federal habeas petition, Mr. Menzies alleged constitutional violations from the Utah courts' failure to provide an adequate transcript. The federal district court rejected those claims. So do we. In our view, the federal district court couldn't grant habeas relief on this claim because the Utah Supreme Court had reasonably

- applied Supreme Court precedent to require a showing of prejudice and

- determined that Mr. Menzies had not shown such prejudice.

**11.1      The Utah courts provided the parties with an opportunity to correct errors in the trial transcript.**

The trial transcript contained many errors. These errors stemmed in part from the court reporter's process. She used shorthand notes, then prepared a transcript with help from a note reader and proofreader. The note reader transcribed the court reporter's notes and marked sections that were hard to read. The court reporter reviewed the note reader's comments and made corrections. The proofreader then reviewed the entire transcript and made more corrections.

Mr. Menzies's trial counsel discovered numerous errors in the eventual trial transcript and moved for a new trial. The trial court referred the motion to the Utah Supreme Court, which remanded the case to the trial court for proceedings to correct the transcript.

On remand, counsel for both sides spent roughly three weeks with the court reporter, trying to correct the mistakes. The court reporter read from her shorthand notes while the attorneys followed along with copies of the original transcript. Together, the court reporter and the attorneys spotted (1) discrepancies between the notes and the transcript and (2) gaps in the transcript (including parts of the voir dire and some of the trial judge's admonitions to the jury).

After the court reporter and attorneys had finished these meetings, the trial court conducted an evidentiary hearing. At that hearing, Mr.

100

Menzies's lead trial lawyer testified, pointing to (1) errors in the original transcript that had not been corrected and (2) mismatches between the court reporter's notes and the original transcript. In the view of Mr. Menzies's attorney, the note reader had tried to fix problems with the court reporter's notes without knowing whether these fixes reflected what had been said at the trial. Given the attorney's testimony, Mr. Menzies argued that the lack of a reliable trial transcript prevented a meaningful appeal in state court.

**11.2      The trial court found no constitutional violation, and the record contained two versions of the transcript.**

The trial court rejected this argument, concluding that the transcript was accurate enough for appellate review. The parties then filed three versions of the transcript with the Utah Supreme Court:

1.      the original version,

2.      the "California" version, which contains the notes of Mr. Menzies's lead counsel regarding alleged gaps and errors, and

3.      another version containing more notes and corrections.

The trial court designated the first two versions as part of the record on appeal. *See State v. Menzies*, 845 P.2d 200, 224 (Utah 1992).

**11.3      The Utah Supreme Court upheld the trial court's ruling that the transcript was accurate enough for a meaningful appeal.**

In the state-court appeal, Mr. Menzies advanced legal and factual challenges to the trial court's ruling. As a legal challenge, he contended

101

that the trial court had erroneously required him to show prejudice from the errors. And factually, Mr. Menzies contended that the trial court should have found prejudice.

The Utah Supreme Court rejected these legal and factual challenges for three reasons:

1.  "The clear weight of authority requires a showing of prejudice to overturn a conviction on the basis of transcription errors," and Utah courts had followed that approach.

2.  The cited errors could be reconciled based on the context and didn't bear on the underlying appellate issues.

3.  It was "possible to cure any conceivable prejudicial errors without retrying the case."

*State v. Menzies,* 845 P.2d 220, 228–29 (Utah 1992).

**11.4    The Utah Supreme Court's decision was not based on an unreasonable application of clearly established federal law.**

Mr. Menzies challenges this reasoning, arguing in part that the Utah Supreme Court unreasonably applied clearly established federal law. Mr. Menzies failed to preserve this argument, and it's invalid.

In federal district court, Mr. Menzies didn't argue that the state courts had unreasonably applied clearly established federal law when addressing the transcription errors. As a result, Mr. Menzies failed to preserve this argument for appellate review. *See Grant v. Royal*, 886 F.3d 874, 909 (10th Cir. 2018) (concluding that the failure to make an argument under § 2254(d)(2) prevented appellate review); *Harris v. Sharp*, 941 F.3d

102

962, 975 (10th Cir. 2019) ("Even in habeas cases involving the death penalty, we consider arguments forfeited or waived when they are raised for the first time on appeal.").

Even if Mr. Menzies had preserved this argument, we wouldn't question the reasonableness of the Utah Supreme Court's application of clearly established federal law. For clearly established federal law, Mr. Menzies relies on the United States Supreme Court's recognition of a constitutional right to meaningful appellate review of a criminal defendant's conviction and sentence. *See Evitts v. Lucey*, 469 U.S. 387, 393 (1985).

This right includes "a 'record of sufficient completeness' for adequate consideration of the errors assigned." *Draper v. Washington*, 372 U.S. 487, 497 (1963) (quoting *Coppedge v. United States*, 369 U.S. 438, 446 (1962)). But a record of sufficient completeness does not necessarily mean a verbatim transcript. *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971). "Alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise." *Draper*, 372 U.S. at 495. When the appellate arguments create a "colorable need for a complete transcript," the State must show that something less (like part of a transcript or an alternative) would suffice. *Mayer*, 404 U.S. at 195.

103

Mr. Menzies's appeal involved a mistake-riddled transcript rather than a transcript that's incomplete. Given these mistakes, Mr. Menzies contends that he shouldn't have had to show prejudice. In applying the precedents of the United States Supreme Court, however, we have held that habeas petitioners challenging transcription errors must show prejudice to their ability to pursue an appeal in state court. *Capps v. Cowley*, 63 F.3d 982, 983 (10th Cir. 1995); *United States v. Clark*, 596 F. App'x 696, 699–700 (10th Cir. 2014) (unpublished); *Harden v. Maxwell*, No. 00-7032, 2000 WL 1208320, at *1 (10th Cir. 2000) (unpublished). Other circuits have also required habeas petitioners to show prejudice from errors in the trial transcript. *Higginbotham v. Louisiana*, 817 F.3d 217, 222 (5th Cir. 2016) (per curiam); *White v. State of Fla., Dep't of Corrs.*, 939 F.2d 912, 914 (11th Cir. 1991); *Bransford v. Brown*, 806 F.2d 83, 86 (6th Cir. 1986); *Mitchell v. Wyrick*, 698 F.2d 940, 941–42 (8th Cir. 1983). Given these opinions from our court and others, we can't question the reasonableness of the state court's requirement for Mr. Menzies to show prejudice. *See Mollett v. Mullin*, 348 F.3d 902, 913 (10th Cir. 2003) (stating that our prior opinion is relevant because it could serve as a guide in determining the reasonableness of a state supreme court's application of Supreme Court case law); *accord* 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice & Procedures* § 32.3 (7th ed. 2021) (stating that "circuit

precedents . . . can shed light on the 'reasonableness' of the state court's application of existing Supreme Court precedents").

The circuit courts' requirement of prejudice is reasonable given the absence of Supreme Court precedent, for "[t]here is no Supreme Court . . . authority on the due process implications of a state court's failure to record portions of a criminal trial." *Madera v. Risley*, 885 F.2d 646, 648 (9th Cir. 1989). Challenging the prejudice requirement, Mr. Menzies points to *Mayer v. City of Chicago*, where the Supreme Court addressed the failure to provide a criminal defendant with *any* transcript. 404 U.S. 189, 190, 198 (1971).

But *Mayer* provides little help because our issue doesn't involve the failure to provide a transcript. The State provided a transcript of more than 3,000 pages, and Mr. Menzies had a chance to thoroughly review these pages and propose corrections.

In circumstances like ours, courts have not read *Mayer* to relieve a defendant of the burden to show prejudice from transcription errors. For example, the Sixth Circuit observed that "*Mayer* does not stand for the proposition . . . that where a portion of a trial transcript is missing and unobtainable, and where a defendant makes a claim that could possibly implicate that portion of the transcript, a retrial is always necessary." *Scott v. Elo*, 302 F.3d 598, 604 (6th Cir. 2002). Instead, when part of a transcript

105

is missing, habeas relief is warranted only if the petitioner shows prejudice. *Id.*

Regardless of whether the Sixth Circuit was correct, fair-minded jurists could reasonably conclude that *Mayer* doesn't relieve a criminal defendant of the need to show prejudice. As a result, Mr. Menzies's challenge is not only unpreserved but also meritless.

**11.5    The Utah Supreme Court did not base its decision on an unreasonable determination of fact**.

Mr. Menzies also challenges the factual underpinnings of the Utah Supreme Court's decision, arguing that the court unreasonably rejected his allegations of prejudice. The federal district court rejected this argument. We do, too.

**11.5.1    Reliance on the Docketing Statement**

In finding no prejudice, the Utah Supreme Court referred to the issues raised in Mr. Menzies's docketing statement. Mr. Menzies criticizes that reference. But when the court made this reference, the docketing statement provided the only meaningful source to identify the appellate issues.

Mr. Menzies points out that when he filed the docketing statement, the court reporter hadn't yet finished the transcript. Although Mr. Menzies had appealed based on the errors in the transcript, he hadn't yet appealed

106

his conviction or sentence. So in Mr. Menzies's view, the Utah Supreme Court shouldn't have used the docketing statement to gauge prejudice.

Mr. Menzies's argument ignores later developments in his direct appeal. The Utah Supreme Court addressed the transcription errors before turning to other issues. *See State v Menzies*, 845 P.3d 220, 224 (Utah 1992) (noting that "we review only issues concerning the adequacy of the transcript" and "do not reach the merits of the conviction and sentence"). After addressing the transcription issues, Mr. Menzies submitted a 199-page brief raising 44 issues involving his conviction and sentence. Appellant's Opening Br., *State v. Menzies*, No. 880161 (Utah Sept. 14, 1992).

Based on the information in the initial appeal, which involved only transcript issues, the Utah Supreme Court acted reasonably in relying on the docketing statement. When referring to the docketing statement, the court didn't have the benefit of the briefs in Mr. Menzies's second appeal, which would later assert other challenges to his conviction and sentence. Those briefs didn't yet exist. Without the benefit of those briefs, the court needed something to gauge the possible prejudice from the transcription errors. The court thus used the docketing statement as a guidepost to measure prejudice.

Of course, Mr. Menzies later submitted the briefs in his second appeal. When he did so, he could have used his newly asserted arguments

107

to supplement his showing of prejudice. If prejudice hadn't been apparent earlier from the docketing statement, Mr. Menzies could have shown prejudice by tying the transcription errors to his newly asserted arguments. But Mr. Menzies didn't do that. He instead incorporated the arguments on the transcription errors that he had made in his first appeal. Appellant's Opening Br. at 29, *State v. Menzies*, No. 880161 (Utah Sept. 14, 1992).

Given the court's earlier rejection of these arguments, the Utah Supreme Court summarily rejected Mr. Menzies's reiteration of his argument from the prior appeal. *See State v. Menzies*, 889 P.2d 393, 406 (Utah 1994) ("We find Menzies' other claims to be without merit."). Given the summary nature of Mr. Menzies's argument, the court reasonably applied clearly established federal law and the record. *See Wellmon v. Colo. Dep't of Corrs.*, 952 F.3d 1242, 1249 (10th Cir. 2020) ("[U]nder Section 2254(d), we review the reasonableness of a state court's decision in light of the arguments the petitioner raised in the state court.").

**11.5.2    Failure to Provide a Sufficient Transcript of Voir Dire**

Mr. Menzies complains not only of the reference to the docketing statement, but also of gaps and errors in the transcription of voir dire. As Mr. Menzies observes, the transcript omitted some questions and answers and contained errors involving the prospective jurors challenged for cause.

The Utah Supreme Court addressed these errors, but concluded that the record allowed full and fair consideration of any claim involving jury

selection. *State v. Menzies*, 845 P.2d 220, 233 (Utah 1992). For Mr. Menzies's argument that some questions and answers had been omitted from the transcript, the court reasoned that

- many answers could be determined from the context of the questioning,

- most of the gaps concerned capital punishment and a decision on the sentence was ultimately assigned to the trial judge rather than the jury,

- only one to four errors existed for a given prospective juror,

- many questions were redundant, and

- prospective jurors had obtained a list of questions and could read along, suggesting that the judge had asked each the same questions even when the transcript didn't fully record what had been said.

*Id.* at 229–31.

In considering the effect of the transcription errors on determining the prospective jurors challenged for cause, the court explained that their identities were apparent from the jury list, the polling of the jury after the conviction, and the mid-trial questioning of a juror. *Id.* at 229. And at the end of the voir dire, Mr. Menzies's attorney stated that eight prospective jurors had been challenged for cause and not dismissed. *Id.* So "[t]he record [was] adequate to provide [Mr.] Menzies with a full and fair review of any claim relating to jury selection." *Id.* at 233.

109

Mr. Menzies contends that the Utah Supreme Court made unreasonable factual determinations, insisting that no record existed for much of the voir dire. For this contention, he repeats the argument that the court reporter's shorthand notes did not record some questions and answers for prospective jurors. From his comparison of the shorthand notes with the transcript first submitted, he argues that the note reader had sometimes copied questions and answers and inserted them for other prospective jurors. Appellant's Supp. Br. at 6–7.

For example, Mr. Menzies cites instances where the court reporter's notes said only "BLRB" (presumably short for "blurb"). Appellant's Supp. Reply Br. at 2 (citing Trial ROA Dkt. No. 1931, at 35). And questions like these were not transcribed by the court reporter:

- "Would that prevent you from sitting in on this case and trying it on its merits?" [following up on a prospective juror's answer that a family member was a police officer]

- "Do you feel you can listen to the evidence and the evidence alone to reach a fair and impartial verdict?"

California Trial Tr. at 151–52 (discussed at Trial ROA Dkt. No. 1931, at 35–36).

Mr. Menzies also cites his trial attorney's testimony about transcription errors involving the names and numbers of the prospective jurors. Appellant's Supp. Br. at 7 n.6. The attorney testified that

- "[t]here seemed to be a persistent problem with names. . . . Some seemed to be interposed where the note reader[,] who had apparently had written copies of the jury list, had indicated other names," Trial ROA Dkt. No. 1931, at 29,

- "[i]n numerous places on this page [when the court clerk called prospective jurors], the names are either . . . incorrect, and the numbers which the clerk allegedly called out are changed from the typed version [prepared by the note reader] to the version taken down by [the court reporter]. And so it is impossible to tell whether or not they were called in a correct order, or whether improper numbers had been associated with wrong names," *id.* at 52, and

- the transcript often had failed to identify which prospective juror was speaking, *id.* at 113.

From these errors, Mr. Menzies asserts that his attorney couldn't determine (1) which prospective juror had been challenged for cause and (2) whether a biased prospective juror had been selected for the jury.

We conclude that the Utah Supreme Court acted reasonably in determining the facts. A reasonable jurist could find that the court reporter's errors in voir dire hadn't prevented a meaningful appellate challenge like an erroneous denial of a challenge for cause.

Contrary to Mr. Menzies's contention, the transcript properly reflects challenges to the prospective jurors. When voir dire ended, Mr. Menzies's lead attorney said that she was preserving her challenges for cause even though they'd been denied. *See* Original Trial Tr. at 892. And on direct appeal, Mr. Menzies argued that the trial court had erroneously rejected challenges for cause, identifying the jurors chosen after being challenged.

111

Appellant's Opening Br. at 29–38, *State v. Menzies*, No. 880161 (Utah Sept. 14, 1992). So the Utah Supreme Court acted reasonably in finding that the transcript had provided Mr. Menzies with a full and fair opportunity for appellate review of jury selection.

**11.5.3      Omission of a Conference Outside the Jury's Presence**

The transcript also contains a gap when a juror had fainted during the medical examiner's testimony. When the juror fainted, the trial judge and the attorneys conferred outside the jury's presence. But this conference was not transcribed. Given the gap in the transcript, the Utah Supreme Court assumed that Mr. Menzies had preserved any conceivable claim relating to the incident. *State v. Menzies*, 845 P.2d 220, 240 (Utah 1992). Mr. Menzies argues that this assumption wouldn't protect his right to appeal because his appellate attorney couldn't have known what had happened.

The Utah Supreme Court rejected this argument, so we consider the reasonableness of the court's analysis in light of the record, Supreme Court precedent, and the arguments presented. *See* Part 4, above (the record and Supreme Court precedent); *Wellmon v. Colo. Dep't of Corrs.*, 952 F.3d 1242, 1249 (10th Cir. 2020) (arguments presented).

In his opening brief in the first appeal, which addressed the transcription errors, Mr. Menzies said nothing about prejudice. In his reply brief in that appeal, he devoted only one sentence to prejudice: "The

occurrences surrounding the fainting of the juror directly affect this appeal and are not adequately recorded." Appellant's Reply Br. at 24, *State v. Menzies*, No. 880161 (Utah May 30, 1991). The Utah Supreme Court disagreed, reasoning that

- the transcript contains all of the medical examiner's testimony and the trial judge's discussion with the juror who had fainted,

- the trial court did not make any rulings during the excerpt that hadn't been transcribed, and

- the attorneys later reargued the points discussed off the record.

*State v. Menzies*, 845 P.2d 220, 240 (1992).

The court's rationale constituted a reasonable disposition of Mr. Menzies's one-sentence argument on prejudice. In similar circumstances, we've appraised prejudice based on the significance of the excerpts that aren't transcribed. *See United States v. Haber*, 251 F.3d 881, 889–90 (10th Cir. 2001) (concluding that "untranscribed portions of the trial in this case do not constitute 'significant and substantial' omissions from the trial transcripts" and were not prejudicial). And the Eleventh Circuit has concluded that omission of a bench conference, lasting 1 hour and 45 minutes, was not substantial and significant for a long and complex trial. *United States v. Stefan*, 784 F.2d 1093, 1102 (11th Cir. 1986). Similarly, the D.C. Circuit has concluded that the failure to transcribe eight bench conferences didn't require reversal because the gaps didn't appear

113

particularly significant and the defendant hadn't made a specific claim of prejudice. *United States v. Winstead*, 74 F.3d 1313, 1321–22 (D.C. Cir. 1996). And the Fifth Circuit declined to reverse when the court reporter had failed to transcribe 9 bench conferences, regarding the gaps insignificant when the transcript spanned over 3000 pages. *United States v. Aubin*, 87 F.3d 141, 149 (5th Cir. 1996).

Here the guilt phase lasted 10 days, and 55 witnesses testified. In this long, complex trial, Mr. Menzies insists that his appellate attorneys couldn't have known what had been discussed at the bench conference. But one of Mr. Menzies's attorneys at the bench conference (Brooke Wells) later represented Mr. Menzies on appeal. Her presence at the bench conference could bear on the inquiry as to prejudice:

> When a defendant is represented on appeal by the same attorney who defended him at trial, the court may properly require counsel to articulate the prejudice that may have resulted from the failure to record a portion of the proceedings. Indeed, counsel's obligation to the court alone would seem to compel him to initiate such disclosure. The attorney, having been present at trial, should be expected to be aware of any errors or improprieties which may have occurred during the portion of the proceedings not recorded.

*United States v. Selva*, 559 F.2d 1303, 1305 (5th Cir. 1977); *accord United States v. Charles*, 313 F.3d 1278, 1283 (11th Cir. 2002) (per curiam) ("If the same attorney represents an appellant at trial and on appeal, a new trial may be granted 'only if the defendant can show that the failure to record and preserve a specific portion of the trial visits a hardship on him and

114

prejudices his appeal.'" (quoting *United States v. Preciado-Cordobas*, 981 F.2d 1206, 1212 (11th Cir. 1993))).

Of course, the attorneys might have forgotten some error made at the bench conference. But the Utah Supreme Court found that (1) the attorneys had later reargued the points discussed in the bench conference and (2) the trial judge hadn't made any rulings during the bench conference. Mr. Menzies does not challenge these findings. Given Mr. Menzies's attorneys' opportunity to reargue the points and rulings from the bench conference, the Utah Supreme Court could reasonably regard the possibility of an unrecorded error as speculation. *See Scott v. Elo*, 302 F.3d 598, 604–605 (6th Cir. 2002) (concluding that a habeas petitioner had failed to show prejudice from a gap in the transcript of closing argument in part because "the prosecutor could not recall any objections during closing arguments, and defense trial counsel did not dispute the prosecutor's account").

Mr. Menzies hasn't identified issues that he could have raised with transcription of the proceedings involving the fainting incident. The omission alone doesn't signal prejudice. Without more, the Utah Supreme Court acted reasonably in finding that the record had allowed appellate challenges involving the fainting juror.

### 11.5.4    Additions by the Note Reader

Mr. Menzies cites instances when the note reader made additions and corrections to the court reporter's shorthand notes. In Mr. Menzies's view,

115

these additions and corrections prevent a reliable record of the trial proceedings.

The Utah Supreme Court rejected this challenge, reasoning that the note reader's changes created minor discrepancies that were not prejudicial. *State v. Menzies*, 845 P.2d 220, 231 (Utah 1992). The court saw little significance from these changes because they would bear only on the preservation of particular issues. *Id.* at 235.

Mr. Menzies cites ten changes by the note reader:

1.  adding the name of a co-inmate who complained to a jailer, Appellant's Supp. Br. at 7 (citing Trial ROA Dkt. No. 1931, at 61),

2.  clarifying a statement by Mr. Menzies about what had been taken from his cell, *id.* (citing Trial ROA Dkt. No. 1931, at 72),

3.  changing a statement by Mr. Menzies's trial counsel from "[w]e have *come who is* in distress in there" to "[w]e have *to calm who is* in distress in there" (discussing the juror who fainted), *id.* (citing Trial ROA Dkt. No. 1931, at 78) (emphasis added),

4.  correcting testimony from an expert witness that "I would be *picking up the . . . SHER*" to "I would be *picking up the things that would be consistent in depression*," *id.* (citing Trial ROA Dkt. No. 1931, at 79–80) (emphasis added),

5.  changing an expert's testimony that "there's a number of them which will parallel the same *systems* as people who are having psychological problems" to "there's a number of them who have the same *symptoms* as people who are having psychological problems," *id.* (citing Trial ROA Dkt. No. 1931, at 83) (emphasis added),

6.  adding the judge's statement to the jury ("[W]hile you are excused, please remember the admonitions about talking with anyone, exposing yourself to any publicity regarding this case,

116

Okay?"), *id.* (citing Trial ROA Dkt. No. 1931, at 116), even though the court reporter's notes showed only an asterisk, *see* California Trial Tr. at 557,

7.  using the trial judge's notes on his findings at sentencing to clarify the court reporter's shorthand notes, Appellant's Supp. Reply Br. at 4 (citing Trial ROA Dkt. No. 1931, at 50–51),

8.  adding testimony from an expert witness about the name of an enzyme found on a cigarette butt, *id.* (quoting Trial ROA Dkt. No. 1931, at 59),

9.  changing the court reporter's version of testimony from a jail inmate who had testified that Mr. Menzies admitted to the murder (from "[t]hat came up from the news hearings that *he* had Friday night" to "[t]hat came up from the news hearings that *they* had Friday night"), *id.* (citing Trial ROA Dkt. No. 1931, at 60) (emphasis added), and

10. inserting language from a police report that had not matched the statement in the courtroom, *id.* (citing Trial ROA Dkt. No. 1931, at 73–75).

The Utah Supreme Court reasonably found no prejudice from these discrepancies.

Mr. Menzies disagrees, pointing to the court reporter's apparent use of police reports to supplement the court reporter's notes. We reject this argument.

In the relevant passage, the transcript was addressing a proffer by defense counsel rather than testimony of a witness. *See* Trial ROA Dkt. No. 1931, at 73–75; California Trial Tr. at 2237. The proffer was heard by the trial court, not by the jury. The jury then heard testimony from a witness, and Mr. Menzies doesn't identify errors in the transcription of that

117

testimony. So the state appeals court could reasonably find a failure to show prejudice.

The state appeals court also acted reasonably in addressing the other additions by the note reader. In the Utah Supreme Court, Mr. Menzies asserted that the note reader had concocted statements to make sense of the court reporter's notes. Though Mr. Menzies provided examples, he never said how any of the note reader's additions would have impeded his ability to appeal a particular issue. Given that omission, the Utah Supreme Court acted reasonably in finding no prejudice from the note reader's additions.

### 11.5.5    Errors Involving Numbers

Mr. Menzies also points to transcription errors involving numbers. The Utah Supreme Court acknowledged confusion in the transcript as to the numbers involving "addresses, distances, and dates." *State v. Menzies*, 845 P.2d 200, 236 (Utah 1992). But in the court's view, the confusion did not impair Mr. Menzies's ability to appeal his conviction or sentence.

Mr. Menzies argues that the numerical errors impaired the reliability of testimony involving

- Mr. Larrabee's identification of Mr. Menzies in the wooded area and

- discovery of Mrs. Hunsaker's identification cards at the jail.

In our view, the Utah Supreme Court reasonably concluded that Mr. Menzies had not established prejudice from the alleged transcription errors.

For Mr. Larrabee's testimony, Mr. Menzies's counsel identified only one numerical discrepancy. This discrepancy involved the distance between Mr. Larrabee and Mr. Menzies when they were in the wooded area. Focusing on this discrepancy, Mr. Menzies argued to the Utah Supreme Court that the distance had affected the reliability of Mr. Larrabee's testimony. But in the Utah Supreme Court, Mr. Menzies never argued that the discrepancy regarding the distance had affected his ability to raise an appellate issue involving Mr. Larrabee's testimony.

With no such argument, the Utah Supreme Court examined the record and concluded that the discrepancy wasn't prejudicial. The court pointed out that (1) Mr. Larrabee had spotted the man three times and (2) the discrepancy involved only Mr. Larrabee's first sighting of the man with a woman. *See State v. Menzies*, 845 P.2d 220, 237 (Utah 1992). The first sighting wasn't material, the court explained, because Mr. Larrabee acknowledged that he couldn't see the other man's face. *Id.* Given Mr. Larrabee's inability to see the other man's face, the Utah Supreme Court concluded that the distance was "not particularly relevant." *Id.* Even now, Mr. Menzies doesn't say why this conclusion was unreasonable.

For Mrs. Hunsaker's identification cards, Mr. Menzies argues that the times stated in the transcript were essential to the State's theory (that he had obtained the cards when he abducted her and had then discarded them at the jail). We agree that the times were important to the State's theory linking Mr. Menzies to the crime. But the discrepancy between the transcript and the court reporter's notes does not undermine the prosecution's theory regarding the identification cards.

A jail officer testified that he had discovered the cards in a dressing room "between 6:30 and 7:00" p.m. on February 24, 1986. Original Trial Tr. at 1561. On cross-examination, the officer acknowledged saying later that he had discovered the cards at "about 6:30 p.m." *Id*. at 1566. Another officer testified that he had arrested Mr. Menzies for an unrelated burglary on February 24 and had brought him to the jail at about 6:40 p.m. Original Trial Tr. at 1540. The second officer reported that Mr. Menzies had broken away from the officers, run into the dressing room where the cards were found, and remained alone there for several seconds.

In closing arguments, the parties disagreed in their interpretations of this testimony. The prosecution argued that (1) the times were approximate and (2) Mr. Menzies had arrived at the jail before the first officer's discovery of Mrs. Hunsaker's identification cards. *Id*. at 2622–24. Mr. Menzies's attorney countered that the first officer had found the cards at 6:30 p.m., which preceded Mr. Menzies's arrival at the jail. *Id*. at 2667. As

a result, his attorney asserted, the prosecution had not shown that Mr. Menzies had obtained Mrs. Hunsaker's identification cards. *Id.* at 2667–68. Although the times were important to the State's theory, Mr. Menzies has not shown how the transcription errors had prevented an appellate challenge.

Mr. Menzies apparently faults the Utah Supreme Court for failing to infer that the court reporter had misstated these times because she had made other errors about other numbers. But the Utah Supreme Court could reasonably decline to draw that inference, for Mr. Menzies's attorney had an opportunity to review the court reporter's notes, compare those notes to the final version of the transcript, and propose corrections. *See State v. Menzies*, 5 P.2d 220, 224 (Utah 1992). Because this procedure revealed no reporting errors involving the timing of events at the jail, we reject this challenge to the adequacy of the transcript.

\* \* \*

In summary, the Utah Supreme Court reasonably concluded that the transcription errors did not prevent meaningful appellate review of Mr. Menzies's conviction or sentence.

121

**12.**    **A certificate of appealability is unwarranted on the admissibility at trial of Mr. Britton's testimony from the preliminary hearing.**

Mr. Menzies moves to expand the certificate of appealability to challenge the introduction at trial of Mr. Britton's testimony from the preliminary hearing.

Mr. Britton appeared at the trial, but he refused to testify. Mr. Britton explained that he feared for his safety if he testified.

Following this refusal to testify, the trial court ruled that (1) Mr. Britton was "unavailable" and (2) the preliminary hearing testimony was admissible. Mr. Menzies moved to suppress the testimony from the preliminary hearing, but the trial court denied the motion. The testimony was then read to the jury.

On direct appeal, Mr. Menzies argued that introduction of testimony from the preliminary hearing had violated his right to confront adverse witnesses. The Utah Supreme Court rejected Mr. Menzies's argument, reasoning that

- "every reasonable effort [had been] made to produce Britton at trial,"

- "the trial court [had] correctly concluded that Britton was unavailable," and

- "the preliminary hearing testimony as a whole . . . [had] contain[ed] sufficient indicia of reliability to warrant its admission at trial."

122

*State v. Menzies*, 889 P.2d 393, 402–03 (Utah 1994).

Mr. Menzies argues that this decision resulted in a violation of the Confrontation Clause. Under the Confrontation Clause, the prosecution could use the preliminary hearing testimony if

- Mr. Britton had been unavailable at trial and

- the testimony at the preliminary hearing had reflected sufficient indicia of reliability.

*Ohio v. Roberts*, 448 U.S. 56, 65–66 (1980), *overruled by Crawford v. Washington*, 541 U.S. 36 (2004).[22]

Mr. Menzies argues that these conclusions rested on unreasonable determinations of fact, which would allow the district court to consider the merits of this challenge. *See* 28 U.S.C. § 2254(d)(2). The district court disagreed, as do we.

## 12.1    Standard for a Certificate of Appealability

Mr. Menzies can appeal this ruling only upon the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A). A member of the panel can issue a certificate only if a reasonable jurist could find Mr. Menzies's appellate argument reasonably debatable. *Laurson v. Leyba*, 507

---

[22]    After the Utah Supreme Court decided the appeal, the United States Supreme Court overruled *Ohio v. Roberts. Crawford v. Washington*, 541 U.S. 36, 60–70 (2004). But *Ohio v. Roberts* controlled when the Utah Supreme Court rendered a decision.

F.3d 1230, 1232 (10th Cir. 2007). Applying this standard, we decline to expand the certificate of appealability to encompass this challenge.

## 12.2        Mr. Britton's Unavailability

The state trial court found that Mr. Britton was unavailable during the trial. And on appeal, the Utah Supreme Court agreed, explaining that Mr. Britton had "repeatedly refused to testify despite the judge's order to do so" and "every reasonable effort [had been] made to produce Britton at trial." *State v. Menzies*, 889 P.2d 393, 402 (Utah 1994). Mr. Menzies challenges this finding. But at trial, defense counsel conceded that Mr. Britton was "technically . . . unavailable."

This concession was understandable given Mr. Britton's testimony at trial. When questioned by the State and the trial court, Mr. Britton said four times that he was refusing to testify. And when defense counsel asked about a psychological evaluation, Mr. Britton again refused to answer. This refusal prompted the trial court to order Mr. Britton to answer defense counsel's questions, and Mr. Britton still refused. Given defense counsel's concession and Mr. Britton's refusal to answer questions, the Utah Supreme Court acted reasonably in finding Mr. Britton unavailable to testify at the trial.

Despite the refusal to testify, Mr. Menzies argues that the prosecution failed to make a good-faith effort to obtain Mr. Britton's testimony. Again, however, the Utah Supreme Court's factual assessment

was at least reasonable. The prosecution did obtain Mr. Britton's presence at the trial. His physical presence wasn't the problem. The problem was that Mr. Britton refused to testify once he was there. Any jurist would question the prosecutor's ability to overcome Mr. Britton's resistance. We thus regard the Utah Supreme Court's finding of unavailability as reasonable, and no jurist could disagree.

## 12.3    Reliability

The Utah Supreme Court also concluded that Mr. Britton's testimony at the preliminary hearing had sufficient indicia of reliability. *State v. Menzies*, 889 P.2d 383, 402–03 (Utah 1994). Mr. Menzies challenges this finding, arguing that his trial attorneys had lacked an adequate opportunity to cross-examine Mr. Menzies at the preliminary hearing.

For this argument, Mr. Menzies insists that Mr. Britton lied at the preliminary hearing, falsely denying that a prosecutor had promised a favorable affidavit. Regardless of the truth or falsity of Mr. Britton's testimony about the alleged promise, fair-minded jurists could reasonably conclude that defense counsel had an adequate chance to ask Mr. Britton about promises from the prosecutor. Indeed, defense counsel did ask Mr. Britton at the preliminary hearing about the possibility of favorable treatment based on his cooperation with law-enforcement officers.

125

Given defense counsel's opportunity to cross-examine Mr. Britton about this possibility, no jurist could legitimately question the reasonableness of the Utah Supreme Court's finding on reliability. As the Utah Supreme Court reasoned, "the preliminary hearing transcript indicates that the issue [of Mr. Britton's credibility] was well-explored." *State v. Menzies*, 889 P.2d 383, 403 (Utah 1994).

So we deny a certificate of appealability on this claim.

## 13.   Conclusion

We affirm the denial of the habeas petition and deny the remaining request to expand the certificate of appealability.